```
 1           IN UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF WISCONSIN
 3  _____
 4
    Susan Doxtator, Arlie Doxtator,
 5  and Sarah Wunderlich, as
    Special Administrators of the
 6  Estate of Jonathon C. Tubby,
 7            Plaintiffs,
 8  vs.                      File No. 1:19-cv-00137-WCG
 9  Erik O'Brien, Andrew Smith,
    Todd J. Delain, Heidi Michel,
10  City of Green Bay, Brown
    County, Joseph P. Mleziva,
11  Nathan K. Winistorfer, Thomas
    Zeigle, Bradley A. Dernbach,
12  and John Does 1-10,
13            Defendants.
14  _____
15
16       DEPOSITION OF SERGEANT MIKE KNETZGER
17
    DATE:  July 10, 2020
18
    TIME:  2:26 p.m.
19
    PLACE: Green Bay City Hall (* Witness Location *)
20
           100 North Jefferson Street
21
           Green Bay, Wisconsin 54301
22
23
24  REPORTED BY:   PAULA K. RICHTER, RMR, CRR, CRC
25                 (By videoconference)
```

**BAYNARD DECLARATION EXHIBIT W**

1    APPEARANCES
2  ON BEHALF OF THE PLAINTIFFS:
3  Mr. Forrest Tahdooahnippah, Esq. (By videoconference)
4  DORSEY & WHITNEY, LLP
5  50 South Sixth Street, Suite 1500
6  Minneapolis, Minnesota 55402-1498
7  (612) 340-2600
8  forrest@dorsey.com
9
10 ON BEHALF OF THE BROWN COUNTY DEFENDANTS:
11 Mr. Jose A. Castro, Esq. (By videoconference)
12 CRIVELLO CARLSON, SC
13 710 North Plankinton Avenue, Suite 500
14 Milwaukee, Wisconsin 53203
15 (414) 271-7722
16 jcastro@crivellocarlson.com
17
18 ON BEHALF OF THE GREEN BAY DEFENDANTS:
19 Mr. Gregg J. Gunta, Esq.
20 GUNTA LAW OFFICES, SC
21 9898 West Bluemound Road, Suite 2
22 Wauwatosa, Wisconsin 53226
23 (414) 291-7979
24 gjg@guntalaw.com
25 (APPEARANCES continued on next page)

1           INDEX
2  WITNESS: SERGEANT MIKE KNETZGER            PAGE:
3  EXAMINATION BY MR. TAHDOOAHNIPPAH.......... 5
4
5
6  KNETZGER EXHIBITS MARKED:                  PAGE:
7  EXHIBIT 1    Green Bay Police Department
8              Policy 303 - Control Devices
9              and Impact Weapons.............. 59
10 EXHIBIT 2    Video from Scene, 53:33 in
11             length, DOXT_DA0000062.......... 62
12
13 (Original exhibits attached to original transcript;
14 copies provided to counsel.)
15
16 WARYCH EXHIBITS PREVIOUSLY MARKED AND REFERRED TO:
17 EXHIBIT 1   Amended Notice of Rule 30(b)(6)
18            Deposition of City of Green Bay.... 9
19 EXHIBIT 4   Partial Deposition of Colton
20            Wernecke......................... 13
21 EXHIBIT 11  Green Bay Police Department
22            Policy 300 - Use of Force,
23            DEF_000001467-00001 - 7............ 43
24
25

1        APPEARANCES (Cont.)
2  ALSO PRESENT (By videoconference):
3   - Vanessa Chavez, Esq. - Green Bay City Attorney
4   - Lindsey Belongea - Paralegal with Green Bay City
5     Attorney's Office
6   - Khalid Haleem - Law clerk with Dorsey & Whitney
7   - Susan Doxtator
8   - Arlie Doxtator
9   - Sarah Wunderlich
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          P R O C E E D I N G S
2         (Attorneys stipulate that the court
3  reporter can swear in the witness remotely.)
4         SERGEANT MIKE KNETZGER,
5  duly sworn, was examined and testified as follows:
6              EXAMINATION
7  BY MR. TAHDOOAHNIPPAH:
8  Q. Good afternoon, sir.  Could you please state
9  your name for the record.
10 A. Mike Knetzger.
11 Q. All right.  Knetzger?  Am I saying it
12 correctly?
13 A. That's correct.
14 Q. All right.  And it's Sergeant Knetzger?
15 A. Yes.
16 Q. All right.  Well, thanks for your time today,
17 Sergeant.  Have you ever had your deposition taken
18 before?
19 A. Yes.
20 Q. About how many times?
21 A. I believe twice, but the one I recollect the
22 most was back in the mid-1990s.
23 Q. And was that related to work in law
24 enforcement or something else?
25 A. Work in law enforcement.

1 Q. All right. What kind of case was that?
2 A. It was a case involving a jeweler who had
3 staged a robbery and was suing a corporation.
4 Q. And you mentioned there was another
5 deposition. When was that?
6 A. It would be within the last ten years, I
7 believe, but I can't be for certain. I can't
8 recall.
9 Q. And was that related to your work in law
10 enforcement or was that some separate matter?
11 A. No. That would still be work.
12 Q. And what was that case about?
13 A. I can't recall.
14 Q. Did it relate to excessive force at all?
15 A. No.
16 Q. All right. Was it a civil or criminal
17 matter?
18 A. Like I said, I can't -- I can't recall. I
19 had some significant trauma happen in the last ten
20 years. I just can't recall it.
21 Q. All right. Well, I'm sorry to hear that.
22     Since it's been a while since you've
23 had your deposition taken, I just want to kind of
24 go over a couple ground rules. Mr. Gunta is there
25 with you, and I'm sure he went over this with you,

1 but just so that you know, there's a court
2 reporter here. She administered an oath to you a
3 moment ago.
4     Do you recall that?
5 A. Yes.
6 Q. And she is going to transcribe everything
7 that we say in order to make a record. And that
8 has a few consequences, the first of which is, if
9 you want something to be on the record, you have
10 to say something as opposed to do something. A
11 common sample of this is shaking your head up and
12 down for yes and side to side for no. So instead
13 of like nodding yes, you have to actually open
14 your mouth and say "yes." Make sense?
15 A. Yes.
16 Q. Another consequence is that with certain
17 conversational phrases like "mm-hmm," "uh-uh,"
18 "uh-huh," you know, you can tell usually if you're
19 in the same room with someone and talking with
20 them if that means yes or no or what that means,
21 but when you read it in a transcript, it's just a
22 jumble of letters that no one can really decipher.
23 So instead of saying things like "uh-huh," you
24 have to say "yes" or "no." Understand?
25 A. Yes.

1 Q. She can only write down what one person is
2 saying at a time. I'm going to ask questions.
3 Can you do me a favor and try your best to let me
4 finish my question before you start your answer?
5 A. Sounds good.
6 Q. Mr. Gunta is here. He may have some
7 objections. There's another attorney for Brown
8 County on the line, Mr. Castro. He may have
9 objections. So to prevent everyone from talking
10 at the same time, you may want to just pause and
11 give them some time for objections. Make sense?
12 A. Yes.
13 Q. There isn't a judge on the call. Even though
14 there's quite a few people on this
15 videoconference, the judge isn't one of them, so
16 unless Mr. Gunta specifically tells you not to
17 answer a question, I will be expecting an answer
18 even if he objects. Make sense?
19 A. Yes.
20 Q. Is there anything about today -- oh, yeah,
21 another one that's important is that you
22 understand all my questions. So if you can't
23 understand my question, can you ask me to clarify?
24 A. Yes.
25 Q. And if you go ahead and answer without asking

1 for clarification, I will just assume you have
2 understood the question. Is that fair?
3 A. Yes.
4 Q. Is there anything about today that would
5 prevent you from testifying truthfully?
6 A. No.
7 Q. Is there anything about today that would
8 prevent you from testifying accurately?
9 A. No.
10 Q. Do you understand that you are here today to
11 testify as an organizational representative of the
12 City of Green Bay?
13 A. Correct.
14 Q. All right. And there was -- you were in the
15 room during the testimony of Commander Warych,
16 correct?
17 A. Yes.
18 Q. All right. Did he show you how to access the
19 exhibits that he was looking at?
20 A. He didn't show me, but I observed.
21 Q. All right. Can you go ahead and pull up what
22 was Exhibit Warych Number 1?
23 A. Okay.
24 Q. All right. Have you seen this before?
25 A. Yes.

Page 10

1 Q. All right. The fifth page has a heading
2 called "Topics."
3     Do you see that?
4 A. Yes, I do.
5 Q. All right. My understanding is that you are
6 here today to talk about topics 3, 4, 5, and 6 as
7 it relates specifically to training.
8     Is that your understanding also?
9 A. Yes.
10 Q. Are you here today, as far as you know, to
11 talk about any other topics besides 3, 4, 5, 6?
12 A. Potentially 11.
13 Q. All right. Any others?
14 A. No, I don't believe so.
15 Q. All right. You mentioned you're a sergeant.
16 What division are you in?
17 A. I'm in the patrol division.
18 Q. Do you have some sort of job responsibility
19 as it relates to training that makes you uniquely
20 qualified to talk about topics 3, 4, 5, 6?
21 A. I'm on the training units with the police
22 departments and I'm also a Department of Justice
23 trainer.
24 Q. What does it mean to be a Department of
25 Justice trainer?

Page 11

1 A. I train in -- it's what's referred to as
2 unified tactics. Those are all of the tactical
3 disciplines within the State of Wisconsin
4 Department of Justice curriculum. And I've been
5 teaching academically and at the police academy
6 level for the past 20 years.
7 Q. When you say you've been teaching
8 academically, where do you teach or where have you
9 taught?
10 A. Northeast Wisconsin Technical College,
11 Rasmussen College, a college in St. Augustine,
12 Florida. It was a community college. Colorado
13 Technical University. And I've taught on various
14 campuses within the technical college system in
15 Wisconsin.
16 Q. How long have you been with the Green Bay
17 Police Department specifically?
18 A. I've been with the Green Bay Police
19 Department since January of 1997.
20 Q. And when were you promoted to sergeant?
21 A. I was one of the first batch of newly
22 promoted sergeants, which I believe -- we are in
23 2020 now, so 2018, I believe. Early 2018.
24 Q. All right. What did you do to prepare
25 yourself to testify at this deposition today?

Page 12

1 A. Met with counsel and reviewed the materials
2 that were provided to me.
3 Q. Okay. What did you review?
4 A. It was a binder of materials, including some
5 testimony from Lieutenant Michael Jansen and then
6 other Green Bay policies and procedures.
7 Documents that were discussed today.
8 Q. Did you review anything else?
9 A. Just the Wisconsin DAT manual, the
10 professional communications manual and the
11 tactical response manual.
12 Q. The DAT manual, the professional
13 communications manual -- sorry. I'm trying to
14 keep up with my notes. What else?
15 A. Tactical response.
16 Q. All right. Any other manuals?
17 A. No.
18 Q. And those three, those are Wisconsin
19 Department of Justice manuals?
20 A. Yes.
21 Q. Did you review the latest version of those
22 manuals or the version that was in effect in 2018?
23 A. The most recent versions, some of which were
24 in effect in '18 and some of which have been
25 updated.

Page 13

1 Q. All right. Did you talk to anyone -- besides
2 counsel, either outside counsel, Mr. Gunta or his
3 staff or the city attorney's office, besides them,
4 did you talk to anyone in preparation for your
5 deposition?
6 A. No.
7 Q. Let's talk about the training regarding
8 search incident to arrest, topic number 3.
9 A. Okay.
10 Q. I would like you to look at an exhibit that
11 was previously marked as Exhibit Warych 4.
12 A. Okay.
13 Q. And if you look at about the third page of
14 the exhibit, this is just excerpts of a
15 deposition, so it says page 19 in the upper
16 right-hand corner.
17     Do you see that?
18 A. Yes.
19 Q. All right. This is Officer Wernecke's
20 testimony about how he was trained to conduct a
21 search incident to arrest. Do you know Officer
22 Wernecke?
23 A. Yes.
24 Q. Were you ever his instructor?
25 A. Yes.

4 (Pages 10 - 13)

www.veritext.com    Paradigm, A Veritext Company    888-391-3376
Case 1:19-cv-00137-WCG    Filed 11/02/20    Page 4 of 20    Document 128-22

BAYNARD DECLARATION EXHIBIT W

Page 14

1 Q. When were you his instructor?
2 A. My best educated guess would be from 2016 or
3 '17 through '18 or '19.
4 Q. All right. So is that providing him
5 instruction at a community college or with the
6 Green Bay Police Department or both?
7 A. That would be both.
8 Q. All right. Were you his -- when he was at
9 the community college, what -- or the technical
10 college, excuse me, what subjects did you instruct
11 him on?
12 A. I don't recall the exact subjects that I
13 instructed him on.
14 Q. Would search incident to arrest have been
15 one?
16 A. I don't know. I would only be guessing.
17 Q. All right. When he was -- joined the Green
18 Bay Police Department, were you the one that
19 instructed him how to do a search incident to
20 arrest?
21 A. That would have been as part of our mini
22 academy, and I don't believe so.
23 Q. All right. I'd like to go through what he
24 said and find out if this is consistent with the
25 training that the Green Bay Police Department

Page 15

1 gives.
2       He says -- the first thing he says
3 is the individual is handcuffed with their hands
4 behind their back.
5       Is that the first step of how a
6 Green Bay police officer is trained to conduct a
7 search incident to arrest?
8 A. That's presuming that they're handcuffed,
9 yes.
10 Q. All right. Next he says their feet are moved
11 apart.
12       Do you train your officers to have
13 that be the second step?
14 A. That -- the manual doesn't provide it in
15 steps. The manual provides a set of guidelines.
16 So that would be an acceptable guideline.
17 Q. And which manual are you specifically
18 referring to now?
19 A. The DAT manual.
20 Q. All right. So moving their feet apart,
21 that's consistent at least with the DAT manual?
22 A. Yes. And the Green Bay Police Department use
23 of force policy adopts the DAT manual.
24 Q. He says next that when he searches, he starts
25 with the right half of the body from the

Page 16

1 perspective of standing behind the arrestee.
2       Is that how officers are trained to
3 do a search incident to arrest?
4 A. Standing behind them? Yes.
5 Q. All right. How about starting with the right
6 half?
7 A. That is acceptable.
8 Q. Is it acceptable to start with the left half
9 as well?
10 A. And the Zoom connection broke up. If you
11 could just repeat the question.
12 Q. Yeah. Is it acceptable to start on the left
13 half rather than the right half?
14 A. Yeah. So it would all depend upon the
15 officer's relative positioning.
16 Q. So if they're behind the -- behind the
17 suspect, can they start at either half, or is
18 there a place they're supposed to start?
19 A. No. They can start on either half. The
20 scenario dictates everything.
21 Q. So when would you start left versus right?
22 A. You may have instances where you have two
23 officers who are searching an individual. You may
24 have assisted an officer to their feet and you
25 found yourself on their left side. You may be a

Page 17

1 left-handed officer that feels more comfortable
2 starting on the left side.
3 Q. All right. And is that the two acceptable
4 scenarios, starting left or right, or could you
5 also start top half, bottom half?
6 A. Absolutely. Those would all be acceptable.
7 Q. And he says he begins on the right half by
8 going over the chest area.
9       Do you train your officers to start
10 on the chest area?
11 A. Again, they follow the guidelines of the DAT
12 manual, and that would be acceptable. They are
13 not trained in a specific methodology. They are
14 trained to follow the guidelines for a thorough
15 search. So this would follow that guideline.
16 Q. All right. Why don't you read this excerpt
17 of his deposition, page 19, lines 2 through 25,
18 and let me know if this is an acceptable search
19 under the DAT guidelines that you just discussed.
20 A. Would you like me to read it aloud or to
21 myself.
22 Q. You can go ahead and read it to yourself.
23 A. Okay. Based upon my review of the
24 transcript, his searching technique would be
25 acceptable.

Page 18

1 Q. All right. Is there anything about his
2 searching technique that although acceptable, it
3 could use improvement?
4 A. Nothing that jumps out to me at this point,
5 no.
6 Q. All right. So officers are trained
7 specifically to check pockets during a search
8 incident to arrest; is that right?
9 A. Yes.
10 Q. And they are also trained to check the
11 waistband of a suspect?
12 A. Yes.
13 Q. And they are trained to check the ankles and
14 legs of suspects?
15 A. Yes.
16 Q. They're trained to check shoes of suspects?
17 A. Yes.
18 Q. How are they trained to check the shoes?
19 A. Again, the scenario is going to dictate the
20 action. So in some instances in the field, if you
21 have a cooperative individual, you may have them
22 take them right off in the field. You may -- you
23 could swipe alongside the shoe where the top of
24 the shoe meets the foot and the ankle area, or you
25 may very well wait until you're in a more

Page 19

1 controlled environment such as the jail and
2 complete that aspect of the search.
3 Q. All right. And officers are also trained to
4 check the crotch area of an arrestee, correct?
5 A. Yes.
6 Q. How are they trained to do that?
7 A. They're trained to use either the back or the
8 blade of the hand.
9 Q. Right. And the same is true for the
10 buttocks?
11 A. Yes. Any sensitive area.
12 Q. And so these are obviously sensitive areas,
13 but they need searching nonetheless because these
14 are areas where weapons or contraband are often
15 hidden. Fair?
16 A. Yes.
17 Q. And all of these areas, whether it's the
18 pockets, ankles, shoes, buttocks, it's all -- one
19 of the primary purposes -- or some of the primary
20 purposes are to detect weapons and contraband,
21 correct?
22 A. Yes.
23 Q. And you would agree with Commander Warych
24 that it's a top priority for officer safety to
25 detect any sort of secretive weapons, correct?

Page 20

1 A. Concealed weapons? Yes.
2 Q. And because officer safety is on the line, is
3 search technique and protocol something that is
4 emphasized during police academy training?
5 A. Yes.
6 Q. And is it something that is also emphasized
7 again during the Green Bay Police Department's
8 mini academy training?
9 A. Yes.
10 Q. And is it important enough to continue to
11 emphasize during the ongoing training that
12 officers receive, their annual training?
13 A. Yes.
14 Q. And using the proper search technique, you
15 know, even small items like a pack of cigarettes
16 can be found. Fair?
17     MR. GUNTA: Objection to the form of
18 the question.
19     Go ahead.
20     THE WITNESS: Are you asking me if
21 someone conducts a proper search they can find a
22 pack of cigarettes?
23 BY MR. TAHDOOAHNIPPAH:
24 Q. Yeah.
25 A. Yes.

Page 21

1 Q. And did you know that Officer Wernecke, when
2 he conducted the search, he actually found a pack
3 of cigarettes on Mr. Tubby?
4 A. No, I'm not aware of that.
5 Q. Do you have any responsibility over the field
6 training program?
7 A. I'm a field training supervisor.
8 Q. All right. So field training officers,
9 they're supposed to know the proper search
10 protocols and techniques?
11 A. Yes.
12 Q. And they're supposed to ensure that their
13 trainees are conducting proper searches in the
14 field during their field training period?
15     MR. GUNTA: Objection to form.
16     THE WITNESS: To the greatest extent
17 possible.
18 BY MR. TAHDOOAHNIPPAH:
19 Q. All right. Does the Green Bay Police
20 Department -- or do Green Bay police officers
21 receive any training specifically on handling
22 arrestees that are resistive in the sally port
23 area of the Brown County Jail?
24 A. I do not recall training specific to that
25 scenario.

Page 22

1 Q. Is there any training that Green Bay police
2 officers receive that is specific to the scenario
3 of an arrestee that is refusing to exit a squad
4 car?
5 A. In any environment?
6 Q. In any environment.
7 A. There is some advanced standing training that
8 some officers have received.
9 Q. All right. And how are they trained to
10 extract someone that is unwilling to exit the back
11 of the squad car?
12 A. So within the context of your scenario, are
13 they actively resisting?
14 Q. You know, why don't you tell me both ways.
15 If they're trained on passive resistance versus
16 active resistance, just tell me both scenarios.
17 A. Well, the only advanced standing training I'm
18 referring to would fall under someone who's
19 actively resisting.
20 Q. I didn't catch that last part. Sorry.
21 A. Would you like me to expand on that?
22 Q. Yes, please.
23 A. The training involves team tactics, which is
24 an essential element of the DAT system. It is a
25 technique that utilizes the forearm of an officer

Page 23

1 to just direct the head of the person away so they
2 can't bite or spit. And then they'll use multiple
3 officers, which is a team tactics philosophy, to
4 safely remove the person from the vehicle while
5 controlling their legs, their torso and their head
6 and controlling their rate of descent to the
7 ground so they can then be controlled and the
8 active violent resistance can be stopped.
9 Q. So is it ever appropriate to force someone
10 out of the squad car -- or use force, excuse me.
11 Is it ever appropriate to use force to get someone
12 out of the squad car if it's just passive
13 resistance, under Green Bay's training?
14 A. Passive resistance -- merely saying "no"
15 should not be met with a force response.
16 Normally, we are going to use our professional
17 communication skills in order to be effective in
18 that regard.
19 Q. Does Green Bay ever train its police officers
20 to introduce OC spray into a squad car, or other
21 car, to force someone to get out if they're being
22 uncooperative?
23 A. There have been instances where OC spray has
24 been deployed in the back seat of cars with
25 individuals who are displaying active resistance

Page 24

1 or its threat.
2 Q. And so is that -- are those instances
3 something that those officers were trained to do?
4 A. It would be a matter of training that occurs
5 in respect to on the job. It is a force option.
6 It is a dynamic application of a trained
7 technique. And I'm aware of it being used in the
8 field multiple times when someone is actively
9 resisting in order to get them safely out of the
10 car, to stop the active resistance.
11 Q. All right. Is it, in your opinion,
12 foreseeable that a firearm could be missed during
13 a search incident to arrest?
14 A. Yes.
15 Q. All right. If it is foreseeable, do you have
16 any training that you provide officers on how to
17 deal with an armed subject that has been placed in
18 the back of a squad car due to a missed weapon
19 during a search?
20 A. You broke up just a little bit right at the
21 end of the question, so just repeat it one more
22 time so I've got the whole thing.
23 Q. Yeah. Maybe the --
24    MR. TAHDOOAHNIPPAH: Court reporter,
25 could you please read that back?

Page 25

1    (The preceding question was read by
2 the court reporter.)
3    THE WITNESS: It is impossible to
4 create scenarios for every possible situation that
5 a law enforcement officer will face. But instead
6 they are given tactics that they are able to apply
7 to various situations. So officers are provided
8 with tactics to address people who may be armed in
9 confined spaces.
10 BY MR. TAHDOOAHNIPPAH:
11 Q. Okay. And what are those tactics that
12 they're provided?
13 A. The concepts are tactics related to isolating
14 the potential threat, setting up perimeters and
15 then attempting to, you know, isolate the threat
16 to minimize harm to everybody involved within the
17 area.
18 Q. So isolating the threat, is that similar to
19 the concept of containment or is that something
20 that's distinct?
21 A. "Containment" would be another acceptable
22 word.
23 Q. So when you're -- just unpack the isolation
24 for me. What are you doing and what are you
25 trying to accomplish by isolating a potentially

7 (Pages 22 - 25)

Case 1:19-cv-00137-WCG   Filed 11/02/20   Page 7 of 20   Document 138-22
Veritext Legal Solutions   www.veritext.com   888-391-3376

BAYNARD DECLARATION EXHIBIT W

Page 26

1 armed subject?
2 A. When you -- when you're able to isolate or
3 contain a threat, you're better able to control
4 that moment. And the more that officers are able
5 to safely and effectively control the moment, the
6 greater chances you're going to have for a
7 peaceful resolution.
8 Q. So in other words, it's a known risk that if
9 you fail to isolate, there could be a violent
10 resolution?
11     MR. GUNTA: Objection to form.
12     You can answer the question.
13     THE WITNESS: I don't think that's a
14 fair characterization, because I've worked many
15 calls where we have isolated and safely resolved
16 events that have not been violent. Your comment
17 is more the exception to the rule.
18 BY MR. TAHDOOAHNIPPAH:
19 Q. Well, the purpose of isolation you said was
20 to try to encourage peaceful resolution or
21 maximize the possibility, right?
22 A. Correct.
23 Q. So if you -- so just kind of the inverse of
24 that would be if you fail to isolate, there would
25 be an increased risk of a non-peaceful resolution,

Page 27

1 a violent resolution?
2 A. You will probably hear me say a lot of this
3 in my testimony today, but the scenario dictates
4 everything. So if you have an armed individual
5 that is armed and they are able to get out into
6 the public and harm other people, that would be a
7 very bad resolution.
8 Q. And so the purpose of isolating is to prevent
9 that from happening?
10 A. The purpose of isolation is control.
11 Q. Right. And so among the purposes of control
12 is to prevent bad things like a person going out
13 into public that's armed and dangerous. Fair?
14 A. That would be one -- that would be one reason
15 for it, yes.
16 Q. And other reasons for isolation is to prevent
17 harm to the officers that are responding, right?
18 A. It could be the officers. It could be other
19 individuals who are present. It could be other
20 individuals that may be near the armed subject.
21 Q. So suffice it to say that without isolation,
22 it's a known risk that there could be harm coming
23 to officers, the public or others that are in the
24 vicinity of an armed subject?
25 A. Again, dependent upon your scenario, yes. If

Page 28

1 an armed subject goes into the public who has
2 threatened to use the weapon on themselves or
3 others, they could be a significant imminent risk
4 to others in the public.
5 Q. Does the Green Bay Police Department use any
6 training scenarios involving barricaded subjects?
7 A. Yes, we have done training scenarios
8 involving barricaded subjects.
9 Q. Do you train your officers to create avenues
10 for surrender for barricaded subjects?
11 A. Yes. That is part of the planning.
12 Q. All right. And when you train your officers
13 to create an avenue of surrender, does that
14 include a physical space for the person to exit
15 the barricade?
16 A. So we don't -- it all depends upon the nature
17 of the operation, is going to dictate or drive
18 what the end result is going to be. So I can talk
19 to you about it from a SWAT perspective or a use
20 of force perspective.
21 Q. All right. Well, let's start with the SWAT
22 perspective.
23 A. So in the context of your question, a SWAT
24 team may do everything they can to drive the
25 person through the front door. They may -- they

Page 29

1 may do that with some chemical munitions, and then
2 they know that the person is hopefully going to
3 come out the front door, which is where we hope
4 they're going to surrender, and the arrest teams
5 can be properly prepared.
6 Q. When you're training to have -- force a
7 person out from a barricade, do you train to have
8 the arrest team ready in the event that the person
9 doesn't surrender?
10 A. Well, the job of the arrest team is to
11 arrest. So did you say in the event they do
12 surrender?
13 Q. They don't surrender.
14 A. No. The job of the arrest team is to arrest.
15 That is their job.
16 Q. So that's only if the person surrenders?
17 Then the arrest team comes in to make the arrest?
18 A. Yes. That is their role, presuming you have
19 enough personnel.
20 Q. Well, what is supposed to happen if you force
21 the person out the front door and they don't
22 surrender?
23 A. That is what your perimeter team is for.
24 Q. All right. And what is the perimeter team
25 supposed to do?

8 (Pages 26 - 29)

Case 1:19-cv-00137-WCG   Filed 11/02/20   Page 8 of 20   Document 128-22
www.veritext.com                    Paradigm, A Veritext Company                888-391-3376

BAYNARD DECLARATION EXHIBIT W

Page 30

1 A. The perimeter team, their primary role is
2 containment.
3 Q. So in the situation we just talked about,
4 there's a barricade. They've been forced out.
5 They don't surrender. Is containment achieved
6 through nonlethal, lethal means? How are they
7 supposed to contain?
8 A. All of them could be an option, dependent
9 upon your scenario.
10 Q. In the situation where the BearCat is being
11 used to house the arrest team, do you train with
12 the door open, the rear door to the BearCat open
13 or closed?
14     MR. GUNTA: Object to the form of
15 the question.
16     THE WITNESS: Again, the scenario is
17 going to dictate everything. I have been a part
18 of or managed operations where we've done it both
19 ways.
20 BY MR. TAHDOOAHNIPPAH:
21 Q. Why would you -- it seems to me that having
22 the door open allows the arrest team to exit
23 expeditiously. Is that the advantage of having
24 the door open?
25 A. Yes, that would be an advantage.

Page 31

1 Q. So in what circumstances would you want the
2 door closed and what is that advantage?
3 A. Maybe you're traveling from one location to
4 another and anticipating that the arrest team is
5 then going to have to alight from the vehicle as
6 soon as they arrive at its location.
7 Q. Any other reasons that the door to the
8 BearCat would be closed, the rear door?
9 A. Other options might be maybe having it closed
10 affords some additional measures of cover because
11 the BearCat allows for cover.
12 Q. Any other reason you can think of that it
13 would be advantageous to have the rear door to the
14 BearCat closed?
15 A. Not off the top of my head.
16 Q. All right. Let's talk about the use of
17 deadly force. Are you familiar with the training
18 that's provided to officers on the use of deadly
19 force?
20 A. Yes.
21 Q. Does Green Bay train its officers to use
22 deadly force in the situation where a resistive
23 subject has been incapacitated?
24     MR. GUNTA: Object to form of the
25 question.

Page 32

1     Go ahead.
2     THE WITNESS: There are -- again,
3 there is no absolute answer to that. There are
4 instances where somebody could be incapacitated
5 and still pose an eminent threat. And you'd have
6 to define incapacitation.
7 BY MR. TAHDOOAHNIPPAH:
8 Q. All right. How about secured? Is that a --
9 is that like a law enforcement phrase that you're
10 familiar with, that a suspect is secured?
11 A. It all depends upon the context of secured.
12 There can be many versions of it.
13 Q. Generally speaking, what does it mean to you?
14 A. Well, I can secure somebody in the back of my
15 car by opening the back door and having them sit.
16 They're secured. I can have handcuffs on them.
17 They're secured. It's more of a general phrase
18 that officers may use.
19 Q. All right. So does Green Bay train its
20 police officers to refrain from using deadly force
21 on a secured subject?
22 A. I don't believe that is a fair question,
23 because a secured subject can pose a deadly force
24 threat.
25 Q. All right. What if -- have you ever done a

Page 33

1 training scenario where someone is armed but their
2 arms are pinned underneath them and they can't
3 move their arms because they have either an
4 officer or something else heavy on top of them?
5 They're pinned down?
6 A. I've never done a training scenario like
7 that.
8 Q. Under the Green Bay's practices, do you think
9 it would be justified to use deadly force against
10 that type of person?
11     MR. GUNTA: Object to the scope and
12 the form.
13     Go ahead.
14     THE WITNESS: Again, the scenario
15 dictates everything, and I'll maintain my previous
16 answer. Just because a person is secure does not
17 mean they are not a deadly force threat. A number
18 of law enforcement officers in America lose their
19 lives every year with people who are quote/unquote
20 secured.
21 BY MR. TAHDOOAHNIPPAH:
22 Q. How many did you say?
23 A. I don't have an exact number for you. But
24 I'm aware of one event in particular from the city
25 of Milwaukee from many years ago when officers had

9 (Pages 30 - 33)

Case 1:18-cv-00137-WCG   Filed 11/02/20   Page 9 of 20   Document 138-22
veritext.com   Paradigm/Veritext Company   888-391-3376
BAYNARD DECLARATION EXHIBIT W

Page 34

1 secured a subject. He was handcuffed. He removed
2 a weapon while he was handcuffed. And when the
3 officers opened up the sally port door, the door
4 of the transport van, he shot the officers with
5 his hands secured behind his back.
6     I'm also aware of Captain John Laux
7 of the Green Bay Police Department, who was nearly
8 disarmed by a man who was secured with his hands
9 behind his back with handcuffs on and was nearly
10 disarmed.
11 Q. All right. This incident with Captain Laux,
12 when was that?
13 A. Captain Laux is now retired. That would be
14 within the last 15 years.
15 Q. All right. And this incident in Milwaukee,
16 when was that?
17 A. I would say that was early -- early 1990s.
18 Q. All right. And you're aware that there's a
19 number of people every year that are unarmed and
20 lose their lives at the hands of law enforcement
21 officers, right?
22 A. That -- I heard "unarmed" and "law
23 enforcement."
24 Q. You're aware that there are a number of
25 people that are unarmed -- unarmed civilians that

Page 35

1 lose their lives at the hands of law enforcement
2 every year also, right?
3     MR. GUNTA: Object to scope and the
4 form.
5     Go ahead.
6     THE WITNESS: Yes, I'm aware of
7 that.
8 BY MR. TAHDOOAHNIPPAH:
9 Q. And there's constitutional protections that
10 are afforded to citizens to prevent something like
11 that. Fair?
12     MR. GUNTA: Objection to form.
13     THE WITNESS: You broke up at the
14 end. But if you're referring to people and their
15 constitutional rights, I completely agree.
16 BY MR. TAHDOOAHNIPPAH:
17 Q. That they have constitutional rights. You
18 agree that they exist?
19 A. Absolutely.
20 Q. All right. So what training do you give to
21 officers to respect the constitutional rights of
22 people to be free from force once they've been
23 incapacitated or secured, especially if they don't
24 pose any further threat?
25     MR. GUNTA: Object to the scope and

Page 36

1 form.
2     THE WITNESS: Officers are trained
3 that when an individual is under control, to
4 follow the follow-through considerations within
5 the DAT manual.
6 BY MR. TAHDOOAHNIPPAH:
7 Q. So there in the DAT manual are something
8 called follow-through considerations?
9 A. Correct.
10 Q. And what does that mean, follow-through
11 considerations?
12 A. The officers check with themselves to make
13 sure they're okay. Now, we are of course
14 presuming some force has been used. Check with
15 the subject, make sure the subject is okay.
16 Render any appropriate aid. Turn over the subject
17 to the appropriate facility and then complete
18 their reports.
19 Q. Does the Green Bay Police Department train
20 its officers that once the threat from a resistive
21 subject is eliminated, they can no longer use
22 force?
23     MR. GUNTA: Objection to form of the
24 question.
25     Go ahead.

Page 37

1     THE WITNESS: Once an individual is
2 under control, the level of force would -- should
3 be reduced accordingly. Just because they're
4 under control doesn't mean they're not posing a
5 threat. Officers can feel threats such as
6 resistive tension, that one might not be able to
7 see.
8 BY MR. TAHDOOAHNIPPAH:
9 Q. But suffice it to say that if someone is
10 under control, that the use of deadly force would
11 not be justified. Agreed?
12 A. In the context of your scenario, if control
13 has been achieved, then deadly force shouldn't be
14 necessary.
15 Q. And you would agree that that's -- that would
16 be a clearly established constitutional right of
17 the person?
18     MR. GUNTA: Object to the form of
19 the question, calls for a legal conclusion,
20 outside the scope.
21     Go ahead and answer.
22     THE WITNESS: I think it is a fair
23 conclusion that if someone is under control and
24 they don't pose a deadly force threat, then deadly
25 force wouldn't be appropriate.

Page 38

1 BY MR. TAHDOOAHNIPPAH:
2 Q. Are Green Bay police officers trained that
3 it's permissible to use deadly force to eliminate
4 a perceived threat even if there is a risk of some
5 crossfire?
6 A. Yes. There is an exception to the rule of
7 isolation called the greater danger theory.
8 Q. And the greater danger theory, that would
9 permit the use of deadly force even if there's
10 some risk of crossfire?
11 A. That is correct.
12 Q. And that's something that all Green Bay
13 police officers are trained on?
14 A. Yes.
15 Q. And that's something that is actually in the
16 DAT manual, isn't it?
17 A. That is correct.
18 Q. So that's something that all Wisconsin
19 certified law enforcement officers are trained,
20 right?
21 A. Yes.
22 Q. All right.
23      MR. TAHDOOAHNIPPAH: Let's take a
24 ten-minute break if that's okay with everyone
25 else.

Page 39

1      MR. GUNTA: Okay.
2      (A break was taken from 3:12 p.m.
3 until 3:20 p.m.)
4 BY MR. TAHDOOAHNIPPAH:
5 Q. Sergeant Knetzger -- did I say that right?
6 A. Yes.
7 Q. Great. How often is the police academy
8 curriculum updated?
9 A. That is a Department of Justice function. I
10 do not know. The regional police academies are
11 updated when the Department of Justice directs
12 them to be updated.
13 Q. So that's something that happens at the level
14 of the State of Wisconsin?
15 A. Correct.
16 Q. How often is the curriculum for the Green Bay
17 Police Department mini academy updated?
18 A. I don't know the answer to that question.
19 Q. All right. Do you know when the last time it
20 was updated was?
21 A. No. Outside of updates -- to my knowledge,
22 the academy training provided to Green Bay police
23 officers is consistent with the most recent
24 curriculum.
25 Q. So you don't know when the last update was?

Page 40

1 A. No.
2 Q. The annual training, how much -- what is
3 that, like a 24-hour requirement or something like
4 that?
5 A. That's the minimum Wisconsin requirement.
6 Q. All right. How many hours does the Green Bay
7 Police Department offer?
8 A. They offer the standard 24 hours to all sworn
9 personnel. Additional training is given to
10 officers and trainers with various disciplines.
11 Q. All right. Are there -- if you're just, you
12 know, a patrol officer without any specialty, then
13 you just get the 24-hour minimum requirement?
14 A. Yes, and whatever training you might send
15 yourself through.
16 Q. So there's some optional additional training
17 that can be taken?
18 A. If the officers choose to put themselves
19 through at their own expense, yes.
20 Q. Okay. I see.
21      The curriculum for those 24 hours,
22 does that change every year or is that static?
23 A. That changes each year. And that curriculum
24 is created by our professional standards division
25 under the direction of Captain Balza.

Page 41

1 Q. All right. Does the training on use of force
2 that's offered in that -- for the police
3 department through the annual training, when was
4 the last time that was updated or changed?
5 A. I don't know. In the context of that
6 question, updated or changed, I don't know.
7 Q. When was the last time it was offered?
8 A. The firearms training is offered annually.
9 Q. Is there any other use of force training
10 that's offered?
11 A. Yes. TASER training is offered every two
12 years, and then we will have occasional on-shift
13 training on various topics.
14 Q. When there's something that's offered, like
15 the TASER training, say, is it -- can police
16 officers choose which classes they go to up to 24
17 hours or do they have to take a certain suite of
18 classes to meet their 24-hour requirement?
19 A. They must take the training offered by the
20 Green Bay Police Department. We do it in-house
21 with our trainers.
22 Q. All right. And so those 24 hours, that's the
23 same for everybody, same courses?
24 A. Yes. The 24 hours, yes.
25 Q. So it's not like there's 36 hours and you can

11 (Pages 38 - 41)

Case 1:19-cv-00137-WCG    Filed 12/02/20    Page 11 of 20    Document 133-22
www.veritext.com    Veritext Legal Solutions    888-391-3376
BAYNARD DECLARATION EXHIBIT W

Page 42

1  just -- of courses and you can just pick 24 hours
2  worth of courses that you want to do. It's a set
3  24-hour course curriculum for each officer?
4  A. Correct.
5  Q. And I presume the training of each officer is
6  maintained on a record somewhere?
7  A. Yes, within the professional standards
8  division, run by Captain Balza.
9  Q. Has any of the training that the Green Bay
10 Police Department offers, whether, you know, the
11 24 hours, any additional courses, the mini
12 academy, changed as a result of this incident
13 involving Mr. Tubby?
14 A. Not that I'm aware of.
15 Q. Has any of the training that's offered by the
16 Green Bay Police Department, again in whatever
17 form, changed as a result of the recent incident
18 with George Floyd?
19         MR. GUNTA: Object to the form of
20 the question and scope.
21         THE WITNESS: No, because our
22 training that we offer our officers, it is our
23 stance that we do not utilize those tactics that
24 were used in that event.
25 BY MR. TAHDOOAHNIPPAH:

Page 43

1  Q. What kind of training does the Green Bay
2  Police Department offer its officers or require
3  its officers to take regarding the duty to
4  intervene to prevent unconstitutional force by
5  another officer?
6         MR. GUNTA: Object to the scope and
7  the form.
8         Go ahead.
9         THE WITNESS: There is a statement
10 within our DAT policy that relates to that. And I
11 should say our defensive and arrest tactics
12 policy -- or use of force policy, to be more
13 accurate.
14 BY MR. TAHDOOAHNIPPAH:
15 Q. So are you referring to like the Green Bay
16 use of force policy, what is it, 300?
17 A. It should be -- yeah, in the policy section,
18 there should be a statement that addresses your
19 question.
20 Q. All right. So let's go to Exhibit Warych
21 12 -- oh, no, sorry. That's the wrong one.
22 Exhibit Warych 11.
23 A. Okay.
24 Q. All right. So this is the Green Bay Police
25 Department use of force policy, correct?

Page 44

1  A. Yes.
2  Q. Can you point me towards where in this policy
3  is the training on the duty to intervene that you
4  were discussing a moment ago?
5  A. 300.2.1, duty to intercede.
6  Q. So that is on the bottom of the first page?
7  A. That is correct.
8  Q. So this is -- this is a policy manual
9  chapter, right?
10 A. Yes.
11 Q. This isn't like the -- this isn't a training
12 outline or training materials, per se?
13 A. No, but there's training related to this
14 subject.
15 Q. All right. So how much training do officers
16 receive on this subject?
17 A. Within the professional communications
18 manual, there is a subject universally known as an
19 officer override. An officer override is very
20 similar to the duty to intercede.
21 Q. So that professional communications manual
22 that you're referring to, that's something that's
23 published by the Wisconsin DOJ?
24 A. Yes. And adopted by the City of Green Bay.
25 Q. So in there they talk about officer override.

Page 45

1  I've seen that before. But again, is that --
2  that's not like a training outline or something.
3  So how can I know how much training on the duty to
4  intervene is given to Green Bay police officers?
5  A. You would have to reference a lesson plan
6  submitted to an academy to see the amount of time
7  that was spent on officer overrides. I can tell
8  you, in addition to the academy training at the
9  Green Bay PD mini academy, I teach the
10 professional communications section. Every
11 officer, including Officer Wernecke, since he was
12 mentioned, has been through my training. Not only
13 is he given a block of instruction on officer
14 overrides; he is also given a scenario on officer
15 overrides.
16 Q. All right. And that scenario, is that just
17 part of the standard curriculum, not just limited
18 to Officer Wernecke?
19 A. It's part of the standard -- my standard
20 curriculum, yes, and I can testify to that.
21 Q. Does that scenario involve use of force?
22 A. It is -- that scenario involves a
23 communication scenario of inappropriate
24 communication, which could lead to force.
25 Q. Right. And officer override, that applies to

12 (Pages 42 - 45)

www.veritext.com    Veritext Legal Solutions    888-391-3376
Case 1:19-cv-00137-WCG   Filed 11/02/20   Page 12 of 20   Document 133-23
BAYNARD DECLARATION EXHIBIT W

Page 46

1 inappropriate communication and use of force.
2 Fair?
3 A. I would agree.
4 Q. So of the officer override training and your
5 curriculum, how much is dedicated specifically to
6 intervening to prevent excessive force?
7 A. The idea of intervening isn't a subject
8 within itself. The idea of intervening is a
9 concept that officers -- that's part of the entire
10 curriculum. It's just not pigeonholed. So I
11 would say there's hours spent on that concept.
12 Q. In the context of officer override, between
13 communication and use of force, what proportion of
14 the instruction is on communication and what
15 proportion is on use of force?
16        MR. GUNTA: Objection, scope and
17 form.
18        Go ahead, sir.
19        THE WITNESS: Again, you'd have to
20 refer to a lesson plan that is consistent or
21 derived from this -- the DOJ materials in order to
22 best answer that question.
23 BY MR. TAHDOOAHNIPPAH:
24 Q. All right. How about when you're giving the
25 training in your mini academy?

Page 47

1        MR. GUNTA: Same objections.
2        Go ahead, sir.
3        THE WITNESS: My training is a
4 four-hour block.
5 BY MR. TAHDOOAHNIPPAH:
6 Q. And how much -- what proportion of that
7 relates to communication and what relates to use
8 of force as it concerns officer override?
9        MR. GUNTA: Same objections, scope
10 and form.
11        Go ahead.
12        THE WITNESS: It is a theme that I
13 constantly revisit, so I would argue that it's
14 contained within the entire training, plus a
15 scenario.
16 BY MR. TAHDOOAHNIPPAH:
17 Q. All right. But the four hours that you
18 reference, what proportion is communication and
19 what proportion is use of force?
20 A. It's only a communication skills segment, so
21 that's all communication skills.
22 Q. Going back to the George Floyd incident, you
23 know, that hasn't caused anyone at the Green Bay
24 Police Department to reexamine how much training
25 is given regarding the duty to intervene?

Page 48

1        MR. GUNTA: You just came through
2 like you were underwater, so it all broke up.
3        Would you read it back to us, ma'am.
4        (The preceding question was read by
5 the court reporter.)
6        MR. GUNTA: Objection; outside the
7 scope, and form.
8        Go ahead.
9        THE WITNESS: The -- not only the
10 George Floyd incident, but any time a significant
11 incident occurs in law enforcement, it causes us
12 to always reexamine our training and our
13 practices. So any incident, not just the George
14 Floyd incident, always causes us to have
15 self-reflection into our training and our tactics.
16 BY MR. TAHDOOAHNIPPAH:
17 Q. So has that self-reflection resulted in any
18 change to the greater emphasized duty to intervene
19 to prevent the use of force?
20        MR. GUNTA: Same objection; outside
21 the scope, and form.
22        Go ahead.
23        THE WITNESS: That topic has been
24 discussed, among others.
25 BY MR. TAHDOOAHNIPPAH:

Page 49

1 Q. But there has been no change to the training
2 as of yet?
3 A. No. Because, again, I go back to my previous
4 answer. We believe our training would not create
5 the environment where that would occur.
6 Q. Is there any training that's given regarding
7 the practice of having a ride-along?
8 A. There is a policy on a ride-along.
9 Q. All right. And are officers trained on that
10 policy at all?
11 A. It's one of the policies that they must read
12 and indicate that they have read, and it's a
13 well-known practice within the police department.
14 Q. Are there any requirements as to when a
15 ride-along can be -- when you can have a
16 ride-along with you on duty?
17        MR. GUNTA: I'm going to object as
18 outside the scope and form.
19        Go ahead and answer.
20        THE WITNESS: I would have to have
21 the policy in front of me. I know there is a
22 years-on requirement, but I would be just guessing
23 on the minimum years that an officer must have on
24 to have a ride-along.
25 BY MR. TAHDOOAHNIPPAH:

13 (Pages 46 - 49)

www.veritext.com    Veritext Legal Solutions    888-391-3376
Case 1:19-cv-00137-WCG   Filed 12/02/20   Page 13 of 20   Document 133-23

BAYNARD DECLARATION EXHIBIT W

Page 50

```
 1  Q. Is there any training about whether it is
 2  appropriate to bring a ride-along to a situation
 3  where there may be an armed subject?
 4  A. It's addressed in the policy.
 5  Q. And what does the policy say about that?
 6  A. Is there a copy of the policy that I can
 7  refer to or would you like me to give you my best
 8  educated summary?
 9  Q. If you can point me to a number, I can try to
10  pull it up if I have it. If you don't know a
11  number, then you're going to have to just give me
12  your best idea and summary.
13  A. I don't have the number in front of me, but
14  the guidelines are --
15          MR. GUNTA: I'm going to object to
16  scope and to form.
17          But go ahead.
18          THE WITNESS: I believe the
19  guidelines are that individuals who are --
20  civilian individuals who are involved in a
21  ride-along should not be brought to a weapons
22  scene. There used to be a rule that they -- we
23  would drop them off at a safe location. We have
24  kind of gotten away from that due to the potential
25  risk it may pose. Ideally, the officer should not
```

Page 51

```
 1  go unless the incident is of such magnitude where
 2  the officer must respond and then to drop off the
 3  individual at a safe location.
 4  BY MR. TAHDOOAHNIPPAH:
 5  Q. It seems to me that some of the training that
 6  is offered in different scenarios is different
 7  between an armed and an unarmed subject; is that
 8  fair?
 9          MR. GUNTA: Objection to the form.
10          Go ahead.
11          THE WITNESS: Again, the scenario
12  would dictate everything, so you obviously create
13  scenarios for armed incidents and unarmed
14  incidents.
15  BY MR. TAHDOOAHNIPPAH:
16  Q. Is there any training about how to determine
17  whether someone is armed when it's ambiguous?
18          MR. GUNTA: Objection to the form of
19  the question and the scope.
20          Go ahead and answer.
21          THE WITNESS: When you use the word
22  "ambiguous," are you referring to unclear?
23  BY MR. TAHDOOAHNIPPAH:
24  Q. Yes.
25  A. And when you're referring to unclear, are you
```

Page 52

```
 1  assuming that there may be some potential
 2  indicators, like I see a bulge here or a bulge
 3  there, or are we just merely being unambiguous and
 4  saying we don't know?
 5  Q. Let's say there's a bulge. You don't know if
 6  it's a weapon or not. How are officers trained?
 7  You know, I assume there's some sort of decision
 8  tree about where to go if they're armed or
 9  unarmed. But, you know, help me out in
10  understanding what the training is when it's
11  ambiguous because it's a bulge but we don't know
12  if it's a weapon.
13          MR. GUNTA: Objection to scope and
14  form.
15          Go ahead.
16          THE WITNESS: The police department
17  has offered training sponsored by the FBI on the
18  characteristics of armed gunmen. In that training
19  officers are trained to look for bulges, if you
20  will, physiological indicators, clothing
21  indicators that may indicate whether or not
22  somebody is armed.
23  BY MR. TAHDOOAHNIPPAH:
24  Q. All right. So if they're going -- you know,
25  you mentioned that a lot of these situations are
```

Page 53

```
 1  dynamic and just require the application of
 2  tactics; is that fair?
 3  A. I'm not sure if I mentioned that, but
 4  oftentimes use of force events are rapidly
 5  unfolding and dynamic.
 6  Q. So given the dynamic nature and the different
 7  response that officers would have if someone was
 8  armed versus unarmed, how are they trained to make
 9  that call when it's -- if it's unclear?
10          MR. GUNTA: Object to the scope and
11  form.
12          Go ahead.
13          THE WITNESS: They are going to rely
14  upon their training and experience from what
15  they've received in the police academy, to any
16  specialized training and their experiences in the
17  field. Every officer is different.
18  BY MR. TAHDOOAHNIPPAH:
19  Q. If an officer perceives or believes someone
20  to be armed, are they trained to communicate that
21  fact to other law enforcement officers?
22  A. Ideally, yes.
23  Q. And are they trained to specifically say that
24  the suspect is armed or has a gun?
25  A. I would not -- I don't think the word
```

Page 54

1  "specific" is an accurate characterization, but
2  ideally, if time permits, they should convey
3  something to indicate that the person is armed.
4  Q. All right. If they believe the person is
5  armed, then wouldn't you agree that it's
6  important, if time permitting, to say that the
7  person is armed rather than that the person has
8  just something in their hands or something similar
9  like that?
10         MR. GUNTA: Objection on scope and
11 form.
12         Go ahead.
13         THE WITNESS: Ideally, the more
14 specific the language, the better.
15 BY MR. TAHDOOAHNIPPAH:
16 Q. And how about kind of language -- are they
17 trained to use any particular language if they
18 believe someone is armed?
19         MR. GUNTA: Objection; scope and
20 form.
21         Go ahead.
22         THE WITNESS: Yes. In the academy
23 training that I have been a part of, we have
24 trained them to use phrasing that is clear and
25 simple, such as "gun" or "knife."

Page 55

1         MR. TAHDOOAHNIPPAH: All right.
2  Let's take another just short, quick break.
3         (A break was taken from 3:41 p.m.
4  until 3:44 p.m.)
5         MR. TAHDOOAHNIPPAH: On topic 11,
6  the witness mentioned that he would be prepared to
7  talk about that. The same thing was said by
8  Commander Warych. And I think with respect to
9  Commander Warych, the City indicated its
10 preference was just to leave topic 11 for next
11 week when we have Chief Smith. And I just want to
12 confirm that that is also the case for Sergeant
13 Knetzger here.
14        MR. GUNTA: Can you give us a
15 second, please? I want to ask the witness
16 something.
17        (Off the record briefly.)
18        MR. GUNTA: Forrest, I just had a
19 brief conversation with the sergeant, and the
20 sergeant is clearly capable and available and
21 ready to testify on the training regarding the use
22 of OC spray in confined spaces such as a vehicle
23 and probably the most qualified to do that.
24        MR. TAHDOOAHNIPPAH: Well, I'm fine
25 to ask him some questions about it as long as you

Page 56

1  agree that it's not prejudicing my ability to
2  revisit topic 11 with Chief Smith next week.
3         MR. GUNTA: I see no problem with
4  that. I think what the -- I'm just going to state
5  this on the record. I think what the issue was
6  this morning or earlier today with the commander
7  was, he wasn't prepared on the policies, practices
8  and customs, and that was a problem. So let's
9  proceed. I'm not going to say that you have
10 exhausted your area of inquiry on this topic
11 today, but I will say that this officer is the --
12 this sergeant is the most qualified to testify on
13 behalf of the corporation, the training, the use
14 of OC spray in confined spaces such as a vehicle.
15        MR. TAHDOOAHNIPPAH: All right.
16 Great.
17 BY MR. TAHDOOAHNIPPAH:
18 Q. Then why don't you tell me, Sergeant
19 Knetzger, what is the Green Bay police training on
20 using the OC spray in confined spaces such as a
21 vehicle?
22 A. And did you say the police training? Because
23 it did break up there.
24 Q. Yeah.
25 A. So the OC spray curriculum does not

Page 57

1  necessarily address deploying OC spray in the back
2  of a vehicle. It also doesn't specifically say
3  you can only deploy OC spray in X, Y, or Z
4  environment. So regardless as to where OC spray
5  is deployed, you're still going to have to follow
6  the same protocols.
7  Q. Is there any location where it is prohibited
8  or trained not to deploy OC spray?
9  A. There are some environments where we would
10 like to avoid it. Like, for example, in a
11 hospital we try to avoid it because it will get
12 sucked up into all the ventilation system and
13 possibly create a hazard to other patients that
14 are within the environment. So that would be one
15 area we would not ideally -- it's not prohibited,
16 but ideally not to do.
17 Q. Are there any other environments where you
18 train your officers that it is less than ideal to
19 use OC spray?
20 A. Again, I can come up with various scenarios.
21 The general rule of thumb is, you don't want to
22 deploy a less lethal device where it could create
23 a lethal outcome. Like, for example, you wouldn't
24 use a less lethal device on a suicidal subject who
25 is on a bridge.

15 (Pages 54 - 57)

www.veritext.com    Veritext Legal Solutions    888-391-3376
Case 1:19-cv-00137-WCG    Filed 11/02/20    Page 15 of 20    Document 133-22

BAYNARD DECLARATION EXHIBIT W

Page 58

1 Q. Okay. Any other example that you can think
2 of?
3 A. Not at the moment.
4 Q. All right. So as far as locations where
5 training says that OC spray may not be
6 appropriate, hospitals is the main one?
7 A. Yes. That's the most consistent one, I
8 believe.
9 Q. Are there any other spaces, just because of
10 their confined nature, where OC spray is
11 considered to be -- have undesirable effects, like
12 due to just the confined nature of the space?
13 A. Well, I'm not aware of OC ever having any
14 desirable effect. I've been exposed to it many
15 times. So no. It's used in jails in confined
16 spaces all the time.
17 Q. How about greater than an intended effect due
18 to the confined nature? Anyplace where it's
19 discouraged due to a greater effect, due to the
20 confined nature of the environment?
21 A. No, not that I can think of.
22 Q. All right. As far as the protocol for
23 deploying OC spray, OC spray is only supposed to
24 be deployed against active resistive subjects; is
25 that fair?

Page 59

1 A. Active resistance or its threat.
2 Q. All right. Do you train your officers to
3 give a warning before deploying OC spray?
4 A. Ideally, a warning is -- should be given if
5 the scenario allows for it. It's not an absolute.
6 Q. All right. If practical, a warning should be
7 given?
8 A. That sounds fair.
9 Q. All right. I want to mark an exhibit here.
10 Let me find the right one.
11         (Exhibit 1 was marked for
12 identification.)
13 BY MR. TAHDOOAHNIPPAH:
14 Q. There should be one that pops up in front of
15 you that's called -- Knetzger was too long. But
16 it's called Knetzge-1.
17 A. I have it.
18 Q. Have you ever seen this document before?
19 A. Yes, I have.
20 Q. What is it?
21 A. Green Bay Police Department policy 303,
22 control devices and impact weapons.
23 Q. Is this the Green Bay Police Department
24 policy that would govern the use of OC spray?
25 A. Yes. There is a short paragraph on OC

Page 60

1 spray -- two short paragraphs.
2 Q. All right. And that's 303.7, 303.7.1?
3 A. Correct.
4 Q. Those are the two paragraphs?
5 A. Correct.
6 Q. Are you familiar with different cannister
7 sizes of OC spray?
8 A. Yes.
9 Q. Is there a cannister size that's known as an
10 MK-19?
11 A. The MK-19 is referring to a brand name, I
12 believe. Each brand has various different
13 cannister sizes. Some are on an officer's belt;
14 others are larger, with more aerosol in it.
15 Q. Okay. So are you familiar with MK-19?
16 A. I'm familiar with that brand.
17 Q. How large of a cannister is that?
18 A. I don't know the exact size of the cannister.
19 And again, you may be referring to the model or
20 the size of the cannister, so I'm not sure.
21 Q. So others have testified that MK refers to
22 like the brand and the number, like 3, 9, 19,
23 refers to the size; is that accurate?
24 A. That sounds accurate.
25 Q. But are you not familiar with the specific

Page 61

1 size of MK-19?
2 A. No. I would have to look at some data to
3 refresh my memory.
4 Q. Is it true that Green Bay trains its police
5 officers to get medical attention for someone if
6 they've been sprayed with OC and have contact
7 lenses?
8 A. I don't know if that is a requirement.
9 Q. But is it encouraged for someone to seek
10 medical attention for someone that's been sprayed
11 with OC if the person sprayed has contact lenses?
12 A. The City of Green Bay adopts the DAT manual.
13 The DAT manual has a section on OC spray. It
14 indicates people with contact lenses, at some
15 point when the scene is safe, you can -- you have
16 some options. You could allow them to remove the
17 lenses themselves. You could also, if the
18 scenario dictates, have them get medical
19 attention.
20 Q. And that's because some of the spray will get
21 trapped underneath the lens and cause a chemical
22 burn on the eye?
23 A. The -- I don't think the phrase "burn" is
24 accurate. It could cause some additional
25 prolonged irritation.

16 (Pages 58 - 61)

**BAYNARD DECLARATION EXHIBIT W**

Page 62

1  Q.  All right.  If you go to where you're pulling
2  up the exhibits, are you able to see folders that
3  have depositions of other people, with other names
4  and dates on them?
5  A.  Okay.  I have depositions -- deposition of
6  City of Green Bay July 10th, today.  And then
7  marked exhibits.  That's what I see.
8  Q.  All right.  So you don't have other folders
9  for like deposition of Brown County or something
10 like that?
11 A.  No.
12 Q.  All right.  Let me -- give me a second here
13 then just to get an exhibit ready that was marked
14 in a prior depo.
15      MR. TAHDOOAHNIPPAH:  I'm having
16 technical difficulty with opening this file, so
17 let's just take a break for a second, and I will
18 be back when I get this video working.
19      (A break was taken from 3:59 p.m.
20 until 4:13 p.m., after which time Exhibit 2 was
21 marked for identification.)
22 BY MR. TAHDOOAHNIPPAH:
23 Q.  Sergeant Knetzger, I'd like you to go to the
24 41-minute mark of the video that has been marked
25 as Knetzge Exhibit 2.  This is the video that was

Page 63

1  produced with Bates number DOXT_DA00000622.
2  A.  Okay.
3  Q.  You're at the 41-minute mark?
4  A.  Yes.
5  Q.  Do you see the BearCat?
6  A.  Yes.
7  Q.  And there's an officer in the turret?
8  A.  Yes.
9  Q.  And that's Officer Eric Allen.  Do you know
10 him?
11 A.  Yes.
12 Q.  And you see he's holding a blue cannister?
13 A.  I can see a blue cannister, yes.
14 Q.  Do you recognize that as a cannister of OC
15 spray?
16 A.  It could be a cannister of OC spray.  It
17 could also be another chemical munition, but it's
18 a cannister of a chemical munition.
19 Q.  Assuming that is a cannister of OC spray,
20 would you have any idea as to the size of that
21 cannister?
22 A.  It just looks larger than what you carry on
23 your duty belt.
24 Q.  When would Green Bay -- does Green Bay have
25 cannisters that are about that size?

Page 64

1  A.  Yes.
2  Q.  When would Green Bay train its officers to
3  use a cannister of that size?
4  A.  From a training perspective, a cannister of
5  that size is carried by road supervisors and
6  sergeants and by members of the SWAT team.
7  Q.  All right.  And for what purpose are they
8  trained to use those larger cannisters of OC
9  spray?
10 A.  A cannister of OC spray of that size can be
11 used for anything from crowd control, to multiple
12 individuals that might be present, to disperse
13 into a confined space, such as an apartment or
14 house, to cover a distance that may not be as
15 effective with a belt-sized OC spray.  This
16 cannister has a greater range compared to the ones
17 that an officer carries on their belt.
18 Q.  Do you know about how many ounces of OC spray
19 are in a cannister like that?
20 A.  No, I don't.  I'd be guessing.
21 Q.  And the purpose of training -- the purpose of
22 using OC spray is to get a reaction from the
23 person that's hit with the spray, correct?
24      MR. GUNTA:  Object to the form of
25 the question.

Page 65

1       Go ahead, sir.
2       THE WITNESS:  It is to stop active
3  resistance or its threat.  That's the purpose.
4  BY MR. TAHDOOAHNIPPAH:
5  Q.  All right.  So in training officers using OC
6  spray, you know that it may not stop the
7  resistance, right?
8  A.  Correct.  It is not effective all the time.
9  Q.  But even in times when it's not effective
10 with stopping resistance, it may have an effect on
11 the person, right?
12      MR. GUNTA:  Object to the form.
13      Go ahead.
14      THE WITNESS:  Everybody is affected
15 by OC spray differently.
16 BY MR. TAHDOOAHNIPPAH:
17 Q.  But the purpose -- or not the purpose, but
18 the expected outcome of hitting someone with OC
19 spray is to get some form of reaction?
20 A.  It is to get compliance.
21 Q.  You hope for compliance, but you know you'll
22 probably get at least some kind of reaction.
23 Fair?
24 A.  When you refer to reaction, it's -- the
25 reaction is going to depend on its effect.

17 (Pages 62 - 65)

www.veritext.com    Veritext Legal Solutions    888-391-3376
Case 1:19-cv-00137-WCG    Filed 12/02/20    Page 17 of 20    Document 188-23
BAYNARD DECLARATION EXHIBIT W

Page 66

1  Everyone is going to react differently.
2  Q. On what percent of people does it have no
3  effect?
4  A. Do you want an empirical answer or do you
5  want a trainer's experience?
6  Q. Whatever kind of answer you're able to give
7  me.
8  A. From my personal experience, OC spray is
9  effective about 85 percent of the time.
10 Q. Okay. So the strong majority of the time, it
11 will have -- it will create a reaction in the
12 person that's sprayed. Fair?
13         MR. GUNTA: Object to form of the
14 question.
15         Go ahead.
16         THE WITNESS: And the extent of the
17 reaction will depend upon the individual.
18 BY MR. TAHDOOAHNIPPAH:
19 Q. And the extent of the reaction will also
20 depend on the amount of OC spray used. Fair?
21 A. I don't think that's fair.
22 Q. So if I get sprayed in the face for one
23 second versus ten seconds, you would expect the
24 same reaction?
25 A. Yes. I would expect a similar reaction.

Page 67

1  Q. All right. You would expect there to be a
2  greater reaction with more OC spray, wouldn't you?
3  A. In my experience, I have -- I have been
4  exposed to OC spray four times. I don't recommend
5  it. And I have exposed people to OC spray by
6  taking a cotton swab and putting it underneath
7  their eyes. And again, everybody is different. I
8  have had similar effects of a one-second burst and
9  a swab underneath an eye when it comes to an
10 exposure of OC spray. I've had contrasting
11 effects. So everybody's reaction to it is going
12 to be individual dependent.
13 Q. Well, for you, in the four times you were
14 exposed, did you ever get exposed with more or
15 less spray or was it always the same amount?
16 A. No. I've been exposed to various quantities.
17 Q. Well, wouldn't you agree that the time that
18 you were exposed to the greatest quantity was the
19 most unpleasant?
20 A. Not in my experience, no. It's not -- it's
21 not the quantity of the OC spray that determines
22 its effect. It is the Scoville Heat Units.
23 Q. Well, it seems sort of like common sense to
24 me that the more spray you get, the stronger it
25 is. So can you explain why that wouldn't be the

Page 68

1  case?
2          MR. GUNTA: Objection to form.
3          You can answer.
4          THE WITNESS: Because I go back to
5  my same answer much. It's not volume of OC spray
6  that creates the effect; it's the Scoville Heat
7  Units that creates the effect. What typically
8  determines its difference is where it hits
9  somebody on the body. Chest, versus neck, versus
10 forehead, versus nose, versus eyes.
11 BY MR. TAHDOOAHNIPPAH:
12 Q. So if someone is sprayed in the eyes, is that
13 the worst?
14         MR. GUNTA: Object to form of the
15 question.
16         THE WITNESS: I think that calls for
17 an opinion. Do you want my opinion?
18 BY MR. TAHDOOAHNIPPAH:
19 Q. Sure.
20         MR. GUNTA: Hold on a second.
21 Objection to scope and to form.
22         Go ahead.
23         THE WITNESS: I disagree with that
24 statement. The ideal location is just above the
25 eyes due to what is called a splashback effect.

Page 69

1  BY MR. TAHDOOAHNIPPAH:
2  Q. So just above the eyes is the ideal place to
3  hit someone?
4  A. Yes.
5  Q. All right. So assuming the same person is
6  hit in the same location, just above the eyes,
7  wouldn't you agree that more OC spray would cause
8  a greater effect?
9          MR. GUNTA: Objection to form.
10         Go ahead, sir.
11         THE WITNESS: No, I do not agree.
12 BY MR. TAHDOOAHNIPPAH:
13 Q. So even though OC spray has -- it has some
14 essential oils from peppers in it, right,
15 something like that?
16 A. Correct. It's not something like that. It's
17 from peppers.
18 Q. And it's specifically the oils from the
19 pepper?
20 A. Oleoresin capsicum is what it stands for.
21 Q. Fair enough. Which means that there's oils
22 from the --
23 A. The pepper plant.
24 Q. -- from the pepper plant?
25 A. Uh-huh.

18 (Pages 66 - 69)

www.veritext.com        Pleadling 11/02/Veritext Company        Document 828-291-3376
Case 1:19-cv-00137-WCG        Filed 11/02/20        Page 18 of 20        Document 188-22
BAYNARD DECLARATION EXHIBIT W

Page 70

1  Q. And the pepper is what gives it its Scoville
2  Heat Units, right?
3  A. It sure does.
4  Q. So you're telling me that it doesn't matter
5  if you're hit with ten milliliters versus one
6  milliliter of the exact same spray from the same
7  pepper plant? Is that what you're telling me?
8  A. I'm telling you, based upon my training and
9  experience, it is not the quantity of OC that
10 determines its effect; it is the Scoville Heat
11 Units. And again, back to my previous answer, the
12 location of where it's dispersed.
13 Q. So if you have one milliliter of 1,000
14 Scoville Heat Units, it's going to affect you the
15 same as one liter of one of the same substance
16 that's rated at 1,000 Scoville Heat Units. Is
17 that what you're telling me?
18         MR. GUNTA: Objection to the form of
19 the question.
20         Go ahead.
21         THE WITNESS: I think that is a --
22 I'm just going to go back to my previous response.
23 In my experience, the quantity of OC spray is not
24 the determining factor.
25 BY MR. TAHDOOAHNIPPAH:

Page 71

1  Q. Well, I'm not saying it is the determining
2  factor. The determining factor is multifaceted;
3  between location, individual reaction and also
4  quantity. Fair?
5  A. I believe the greater weight is given to
6  Scoville Heat Units.
7  Q. Right. But quantity plays a part, at least
8  some part, in how strong the reaction will be?
9  A. Sure. It may be a factor, but in my
10 experience, it's not the determining factor.
11 Q. All right. But it is a factor. Fair?
12 A. Sure. We'll agree that it's a factor.
13 Q. All right.
14         MR. TAHDOOAHNIPPAH: We've been
15 going a while. Let's take a short break.
16         (A break was taken from 4:23 p.m.
17 until 4:27 p.m.)
18         THE WITNESS: Counsel and court
19 reporter, can I add one thing about the OC spray
20 quantity?
21 BY MR. TAHDOOAHNIPPAH:
22 Q. It's fine with me, yeah.
23 A. I just wanted to add that another reason for
24 the quantity is -- or where it's beneficial is for
25 target acquisition and ensuring that the ideal

Page 72

1  location is hit for its desired effect.
2  Q. And you mentioned the desired effect being
3  compliance with law enforcement; is that right?
4  A. The -- no. The desire -- the purpose of
5  desired effect of utilizing OC spray is to stop
6  active resistance or its threat. That's what
7  it's --
8  Q. And how specifically does OC spray induce or
9  cause the stopping of active resistance or the
10 threat of active resistance?
11 A. Well, when OC -- when OC spray is effective,
12 it causes a burning sensation. That's a layman's
13 term. The way that I describe it is it feels like
14 very hot sand is in your eyes, and every time you
15 blink, you can feel that in there. It causes the
16 hands to come to the face, and it causes most
17 people to want to go to the ground, because the
18 first thing they seek is safety to the ground. So
19 they want to go to the ground and find the ground.
20 And then when you have them on the ground, you can
21 give the surrender ritual commands and then safely
22 take them into custody.
23 Q. You said "surrender ritual commands." What
24 are those?
25 A. That is a universal phrase to describe when

Page 73

1  officers tell people that they are under arrest,
2  stay on the ground, hands out to your sides, palms
3  up and don't move. That's the surrender ritual.
4  Q. And we talked before, it's advisable, it's
5  practical to give a warning and ask someone to
6  surrender before deploying OC in the first place?
7  A. In an ideal circumstance, yes.
8  Q. All right.
9          MR. TAHDOOAHNIPPAH: I don't have
10 any further questions for you at this time. I
11 really appreciate your time this afternoon and
12 waiting around all morning. I appreciate that
13 too. So thank you.
14         THE WITNESS: All right.
15         MR. CASTRO: I don't have any
16 questions.
17         THE WITNESS: Questions, Jose?
18         MR. CASTRO: No, no questions.
19         THE WITNESS: Sorry I addressed you
20 by your first name, by the way.
21         MR. CASTRO: That's okay.
22         THE WITNESS: Am I excused?
23         MR. TAHDOOAHNIPPAH: If Gregg has no
24 questions, then yes.
25         MR. GUNTA: I have no questions.

19 (Pages 70 - 73)

**BAYNARD DECLARATION EXHIBIT W**

Page 74

(The deposition was concluded at 4:30 p.m.)

Page 75

REPORTER'S CERTIFICATE
STATE OF WISCONSIN

I hereby certify that I reported the deposition of SERGEANT MIKE KNETZGER, on July 10, 2020, in Green Bay, Wisconsin, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me to the best of my ability and is a true record of the testimony of the witness; reading and signing was not reserved.

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality.

WITNESS MY HAND AND SEAL THIS 23rd day of July, 2020.

*Paula Richter*

Paula K. Richter, RMR, CRR, CRC
Notary Public, State of Wisconsin
My commission expires on 3/6/2022

Page 76

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

July 24, 2020

To: Mr. Gunta

Case Name: Doxtator, Susan, Et Al. v. O'Brien, Erik, Et Al.

Veritext Reference Number: 4148049

Witness: Sergeant Mike Knetzger    Deposition Date: 7/10/2020

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 77

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4148049
CASE NAME: Doxtator, Susan, Et Al. v. O'Brien, Erik, Et Al.
DATE OF DEPOSITION: 7/10/2020
WITNESS' NAME: Sergeant Mike Knetzger

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____    _____
Date                Sergeant Mike Knetzger

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

**BAYNARD DECLARATION EXHIBIT W**