UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SUSAN DOXTATOR, et al.,

        Plaintiffs,

      v.                                   Case No. 19-C-137

ERIK O'BRIEN, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Jonathon Tubby was fatally shot by a Green Bay police officer after he was transported to the Brown County Detention Center, or jail, following his arrest on the evening of October 19, 2018. The officer who shot Tubby claims he thought Tubby had a gun and posed a serious threat to himself and others. Plaintiffs, Special Administrators of Tubby's estate, dispute the officer's account and claim that the shooting is reflective of a widespread practice within the Green Bay Police Department of excessive and often deadly force enabled by a culture of dishonesty. Plaintiffs also allege that various members of the Brown County Sheriff's Office violated Tubby's constitutional rights by failing to intervene before the fatal shots were fired, failing to train officers to avoid such a situation, and creating the danger that caused Tubby's death. Plaintiffs seek damages under 42 U.S.C. § 1983 for violation of Tubby's constitutional rights by the City of Green Bay, Chief of Police Andrew Smith, and Officer Erik O'Brien (the Green Bay Defendants) as well as Brown County, Sheriff Todd Delain, Captain Heidi Michel, Deputy Joseph Mleziva, Deputy Nathan Winisterfer, and Lieutenant Thomas Zeigle (the Brown County Defendants). The third amended complaint also asserts common law claims for battery and negligence, and state law

statutory claims against the City and County for indemnification of officers for personal liability incurred while acting in the scope of their employment. The Court has jurisdiction over Plaintiffs' § 1983 claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The case is before the Court on Defendants' motions for summary judgment. For the following reasons, Defendants' motions will be granted, and the case will be dismissed.

## BACKGROUND

On the evening of October 19, 2018, Green Bay Police Department (GBPD) Officer Colton Wernecke and his field training officer, Erik O'Brien, were on patrol in the City of Green Bay. At approximately 7:24 p.m., Officer Wernecke observed a vehicle with an unregistered license plate drive through a red light. He decided to initiate a traffic stop, activated his overhead lights, and followed the vehicle. Green Bay Defs.' Proposed Findings of Fact (GBPFOF) ¶ 15, Dkt. No. 118. The vehicle continued to drive and turned into the parking lot of the Hyatt Regency hotel. The vehicle drove through the parking lot despite Officer Wernecke turning on the squad car's overhead lights, shining a spotlight on the vehicle, and blipping the squad car's siren. *Id.* ¶ 16. The vehicle eventually pulled into a parking space. Although the occupants of the vehicle initially gave false identifications, *id.* ¶¶ 24–25, they were ultimately identified as Jonathon Tubby, who was driving the vehicle, and his aunt, Theresa Rodriguez, who was in the passenger seat. *Id.* ¶ 17. A records check disclosed active warrants on each.

Officer O'Brien requested a second squad car to provide cover for the officers, and GBPD Officer Tyler Haack responded. Officers Haack and O'Brien approached the passenger side of the vehicle while Officer Wernecke approached the driver's side. *Id.* ¶ 20. Officer Haack observed what he suspected to be marijuana, and Tubby and Rodriguez were ordered to exit the vehicle. *Id.* ¶ 21. Officer Wernecke handcuffed Tubby behind his back and searched him while Officer

O'Brien observed. Tubby was then placed in the rear seat of Officer Wernecke's squad, while Rodriguez was handcuffed and placed in Officer Haack's squad. Officer Haack then left to transport Rodriguez to the Brown County Jail, while Officers O'Brien and Wernecke stood by with Tubby's vehicle to wait for a tow truck. *Id.* ¶¶ 25–27.

At 7:35 p.m., Tubby was placed in the back of Officer Wernecke's squad car and seat belted in with his hands handcuffed behind his back. *Id.* ¶ 28. The squad's internal camera shows that at 7:40:36, Tubby moved his hands under his butt behind his bent legs as he remained seated, *id.* ¶ 29, and by 7:41, he maneuvered one leg through his handcuffed arms and began putting his right hand up his shirt. He then reached his hand down into his pants. *Id.* ¶ 30. At 7:43, Tubby removed his seat belt, *id.* ¶ 31, and moved his other leg out from under his handcuffed arms. At that time, both of Tubby's hands were in front of his body, still handcuffed together. Tubby put his right hand under his shirt, and he bent forward and manipulated his hand up under his shirt. *Id.* ¶ 32.

At 8:10:56, Officer Wernecke transported Tubby to the Brown County Jail to be booked on possession of marijuana and obstructing charges, as well as for an active warrant. *Id.* ¶ 33. The transport to the Brown County Jail took approximately 12 minutes. *Id.* ¶ 34. Officer O'Brien reported that Tubby remained quiet during the transport to the Jail. Tubby was leaning forward with his hands in front of his body during the transport and upon his arrival at the sally port. *Id.* ¶ 35.

Officers Wernecke and O'Brien entered the sally port of the Brown County Jail at approximately 8:22 p.m. *Id.* ¶ 36. The sally port is an enclosed area in the Jail that provides the secure transition of inmates from the custody of police officers to the intake area of the Jail. The sally port overhead door is controlled by the Jail's master control. *Id.* ¶ 37. Before parking the squad car, Officer O'Brien asked Tubby if he had anything on him. Tubby responded, "no." *Id.*

¶ 36.  After parking the squad car and turning off the engine, Officers O'Brien and Wernecke exited the squad car and placed their gear and weapons in the trunk of the car pursuant to the Jail's policy that prohibits officers from bringing weapons into the Jail.  *Id.* ¶ 38.

When Officer Wernecke went to open the rear driver's side door of the squad car to remove Tubby, he realized that Tubby's hands were not behind him and were balled up under the front of his shirt.  *Id.* ¶ 39.  Officer Wernecke asked Tubby to get out of the squad car, but Tubby did not exit.  *Id.* ¶ 40.  When Officer Wernecke told Tubby to "step out," Tubby remained in the squad car with his hands under his shirt.  Officer Wernecke asked, "Stepping out?" and then instructed, "Come on, bring your foot out," as he reached for Tubby's ankle.  Tubby flinched and backed further into the squad car, still bent forward.  *Id.* ¶ 41.

Officer O'Brien came around from the back of the squad car and looked in the open door. He immediately noticed that Tubby's hands were no longer behind his back and that his hands were under his clothes.  Brown County Defs.' Proposed Findings of Fact (BCPFOF) ¶ 79, Dkt. No. 111.  At that time, Officer O'Brien observed what he believed to be the barrel of a gun pressing against the inside of Tubby's shirt.  GBPFOF ¶ 44.  At 8:25:08, Officer O'Brien ordered, "Jonathon, bring your foot out."  *Id.* ¶ 45.  Officer Wernecke attempted to pull Tubby's foot out of the car, and Tubby stated "don't" and then "I'll fucking do it."  Pls.' Add'l Proposed Findings of Fact to Green Bay Defs.' Mot. for Summ. J. (PPFOFGB) ¶ 23, Dkt. No. 135; Pls.' Resp. to GBPFOF ¶ 45, Dkt. No. 135.

Believing that Tubby was armed and suicidal, GBPFOF ¶ 46, Officer O'Brien immediately slammed the squad car's door closed with Tubby still inside and told Officer Wernecke, "I think he's got a gun."  *Id.* ¶ 48.  Officer O'Brien asked Officer Wernecke what he was thinking, and Officer Wernecke responded that he thought he must have missed something in searching Tubby. *Id.* ¶ 49.  Once Officer O'Brien shut the door, Tubby was locked inside the car.  Pls.' Add'l

Proposed Findings of Fact to Brown County Defs.' Mot. for Summ. J. (PPFOFBC) ¶ 1, Dkt. No. 136.

Officer Wernecke ran to the booking window to alert jail staff that something was wrong. GBPFOF ¶ 50. Officer O'Brien retrieved his handgun from the trunk of the squad car, and he and Officer Wernecke retreated behind the transport van parked next to the squad car. *Id.* ¶ 51. Officer O'Brien radioed police dispatch requesting that another unit be sent to the sally port because "it looked like" Tubby had "something" in his hand and was refusing to exit the squad car. *Id.* ¶ 52. Officer O'Brien later reported over the radio that the male subject had something in his shirt pointed up at his chin and requested that an officer bring a shield from the Bearcat. A few minutes later, Officer O'Brien advised dispatch that Tubby's hands were up by his face, that Tubby was facing the back window, and that the windows were too fogged up to see if there was anything in his hands. Although Officer O'Brien did not state over the radio that he saw a gun, PPFOFGB ¶ 25, he told various responding officers that he thought Tubby had a gun. BCPFOF ¶ 84. That the officers believed Tubby had a gun is also apparent from their reactions and the steps they then took to avoid being shot.

The windows of the squad car began to fog up, and the officers could not see inside the squad car except for some vague movement in the back seat. GBPFOF ¶ 54. At 8:28 p.m., officers yelled to Tubby, "Jonathon, put it down," and Tubby replied, "Fuck you. I'll do it." *Id.* ¶ 55. At 8:29 p.m., Tubby stated, "I'll fucking do it at the first fucking person to open this door," and then, "I'm not going." *Id.* ¶ 56. At 8:31, Tubby stated, "Fuck you. I'll fucking do it," then "Fuck you," and "Shut the fuck up." Shortly thereafter, at 8:32:26, Tubby stated, "I can fucking hear you." At 8:35:09, Tubby stated, "The fuck away from me." *Id.* ¶ 58.

Defendants do not clearly distinguish between what the officers actually heard and saw at the time, and what the internal squad recording shows Tubby to be doing and saying. Plaintiffs

repeatedly contend that there is no evidence that the officers heard Tubby's statements and they are thus irrelevant to the state of mind of the officers. Pls.' Resp. to GBPFOF ¶¶ 55–56, 58. There is some evidence, however, that Tubby could be heard and seen at times. Officer O'Brien instructed Tubby to wipe the windows several times, and at one point, Tubby did wipe the window down. This signaled to Officer O'Brien that Tubby could hear him, and he continued to give commands to Tubby to wipe the windows. GBPFOF ¶ 59. But even if the officers on the outside could not hear and see all that Tubby was saying and doing, the recording confirms the fact, consistent with the earlier observations of Officers Wernecke and O'Brien, that Tubby was acting like he was armed with a gun and threatening to use it.

In the meantime, numerous law enforcement officers from GBPD and the Brown County Sheriff's Office (BCSO) responded to the sally port. *Id.* ¶ 60. At approximately 8:30 p.m., GBPD Sergeant Tom Denney drove into the entrance of the Brown County Jail sally port and parked just inside the entrance. Shortly thereafter, GBPD Officer Walvort responded to the scene and parked his squad car directly outside the sally port entrance. *Id.* ¶ 57. GBPD Lt. Nate Allen was a supervisor that night and responded to the sally port in response to the radio traffic from dispatch. *Id.* ¶ 62. While in route to the sally port, Lt. Allen began developing a plan to extract Tubby from the squad car. He authorized deployment of the Bearcat armored vehicle to provide cover and requested additional pieces of equipment, including 40-millimeter munitions to fire wooden dowels and a glass breaking implement. *Id.* ¶ 63.

Upon arriving in the sally port, Lt. Allen met with Sgt. Denney and GBPD Officer Eric Allen and called GBPD SWAT commander Lt. Gering to discuss options for removing Tubby from the squad car. *Id.* ¶ 64. Lt. Allen planned to drive the Bearcat within a few feet of the squad car, have a shield team with lethal cover open the rear door of the squad car, and give Tubby

commands to exit the vehicle. If Tubby did not exit the vehicle, they would send a K-9 unit to extract him. *Id.* ¶ 65.

Lt. Zeigle was working in the Sheriff's Office building, which is in a separate location from the Jail. BCPFOF ¶ 85. GBPD Lt. Buckman told Lt. Zeigle that a suspect, identified as Tubby, was in the back of a GBPD squad car and had a gun to his head. *Id.* ¶ 86. Lt. Zeigle ordered Sgt. Katers to respond to the scene. *Id.* ¶ 87. Lt. Zeigle then responded to the scene himself and, on his way, spoke with Lt. Allen who briefed him on the situation. *Id.* ¶ 88. Lt. Allen informed Lt. Zeigle that there was a subject in the back of a squad car with his hands and arms up in his shirt with an unknown possible weapon, threatening to harm himself. GBPFOF ¶ 66. There were also multiple officers on scene from GBPD and BCSO who were acting in their capacities as patrol officers and had tactical training and experience. BCPFOF ¶ 90. Lt. Zeigle, Sgt. Katers, Lt. Allen, Officer Salzmann, Officer Allen, and Officer O'Brien were SWAT team members of their respective agencies. *Id.* ¶ 91.

Once on the scene, Lt. Zeigle met with Lt. Allen and Officer Allen to establish a plan. *Id.* ¶ 92. Lt. Allen explained the extraction plan he, Lt. Gering, and Officer Allen had developed. GBPFOF ¶ 67. Lt. Zeigle did not agree with the plan proposed by Lt. Allen. BCPFOF ¶ 93. As the Commander of the Brown County SWAT team, Lt. Zeigle asserted his jurisdiction over the scene and determined that a SWAT activation was not necessary because there were ample resources already on scene, including multiple officers with tactical training, an armored vehicle, and a K-9 unit. *Id.* ¶ 95; GBPFOF ¶ 69. He observed that there were officers on scene with perimeters established, and he was aware that Tubby was not constructively communicating with officers on scene. BCPFOF ¶ 96.

Lt. Zeigle determined that it was appropriate to treat the situation like a barricaded situation. *Id.* ¶ 97. He could not get a visual on Tubby because the squad car's windows were

fogging, *id.* ¶ 98, so he planned to break the back window of the squad car to establish better visibility and offer better communication. *Id.* ¶ 99. If Tubby did not surrender or establish verbal communication following the breakout of the rear windshield, Lt. Zeigle planned to introduce oleoresin capsicum (OC) spray to get a reaction from Tubby and give him an opportunity to establish a dialog and surrender. *Id.* ¶ 100. In Lt. Zeigle's view, whenever OC spray is deployed in an enclosed environment, it is important to give the individual a way out. *Id.* ¶ 101. Lt. Zeigle decided to break out the rear windshield of the squad car rather than the rear-side window because the bars on the side windows would have prevented Tubby from exiting the vehicle if OC spray was introduced. *Id.* ¶ 102. By deploying the OC spray and leaving Tubby a way out, Lt. Zeigle believed Tubby would exit through the rear windshield and surrender. *Id.* ¶ 103. Lt. Zeigle communicated the plan to Lt. Allen, Officer Allen, and Sgt. Katers, *id.* ¶ 104, and observed the implementation of the plan from outside the sally port. GBPFOF ¶ 74.

Sgt. Katers and Officers Salzmann, Allen, Lynch, Merrill, and Christensen formed an arrest team in accordance with the plan. *Id.* ¶ 75. Officers O'Brien, Wernecke, and Denney; Deputies Mleziva and Winisterfer; Lt. Zeigle; and others were standing in various positions near the open sally port door. BCPFOF ¶ 119. At approximately 9:02 p.m. GBPD Officer Merrill drove the Bearcat armored vehicle into position by backing into the sally port next to the driver's side of the squad car. *Id.* ¶ 108; GBPFOF ¶ 75. BSCO Sgt. Katers sat in the front passenger seat, and GBPD Officers Allen, Lynch, Christensen, and Salzmann and K9 Pyro were also inside the Bearcat. GBPFOF ¶ 75. Officers Lynch and Christensen got out of the Bearcat with a shield and handguns, approached the back of the squad car, and closed its trunk to secure the weapons inside. *Id.* ¶ 76. While the Bearcat moved into position, at 9:04 p.m., Tubby, who still had his hand under his shirt, appeared to put something in his mouth through his shirt and stated, "I'll fucking do it." At 9:05 p.m., Tubby faced the back window, and a short time later stated, "I'll fucking do it." *Id.* ¶ 77.

At approximately 9:06 p.m., Officer Allen opened the turret on top of the Bearcat, directed a spotlight into the back of the squad car, and shot a 44-millimeter wooden dowel into the lower passenger corner of the rear windshield of the squad car, breaking a portion of the rear windshield. *Id.* ¶ 78. Tubby leapt back and took cover from the breaking glass, and said, "Fuck you." *Id.* ¶ 79. At 9:07:01, Officer Allen stated, "Jonathon, put your hands up where I can see them." *Id.* ¶ 80. Ten seconds later, Officer Allen repeated, "Jonathon, put your hands up." *Id.* Tubby tucked himself into the corner of the squad car and began to cry. He exclaimed, "Okay!" He then stated, "What are you guys doing to me?" and then stated, "help me" and "I'm scared." PPFOFGB ¶ 31. Tubby did not put both of his hands up. GBPFOF ¶ 80.

At 9:07:29, Officer Allen fired a second wooden dowel round at the squad car, breaking out a bigger portion of the rear windshield, and retreated back into the Bearcat. *Id.* ¶ 81. From the passenger's seat in the Bearcat, Sgt. Katers used a rake tool to clear the remaining glass from the rear windshield that was still obscuring Tubby. *Id.* ¶ 82; BCPFOF ¶ 110. After breaking out the rear window, Officer Allen obtained partial visibility into the back seat of the squad car. He believed he saw Tubby facing the rear windshield with his hands concealed under his shirt holding something under his chin. GBPFOF ¶ 83.

Officer Allen gave Tubby multiple verbal commands to show both of his hands. BCPFOF ¶ 111. Tubby did not show both of his hands. GBPFOF ¶ 84. At 9:08 p.m., Officer Allen commanded, "Put your hands up Jonathon." Tubby made moaning and crying noises but did not show both of his hands. *Id.* ¶ 85. Officer Allen used the loudspeaker and stated, "Jonathon, put your hands up." *Id.* ¶ 86. Tubby did not show his hands but stated, "What are you guys doing to me?" *Id.* At 9:09 p.m., Officer Allen stated, "Jonathon, put your hands up, bud, so I can see them. Come on, Jonathon." *Id.* ¶ 87. Seconds later, Officer Allen stated, "Jonathon, we don't want to hurt you. Put your hands up, bud. Come on, Jonathon." *Id.*

At some point, Officer Allen could see Tubby's left hand outside of his shirt, but Tubby did not show both hands. *Id.* ¶ 88. At 9:10 p.m., Tubby looked out the back window, and Officer Allen stated, "Jonathon, put your hands up for me, bud." *Id.* ¶ 89. Seconds later, Officer Allen stated, "Put your hands up for me, Jonathon. I can see that one is clear. Let me see your other hand. Let me see your other hand, bud." *Id.* Tubby did not show both of his hands. *Id.* Officer Allen was handed a canister of OC spray. *Id.* ¶ 90. At 9:10:51 p.m., Officer Allen deployed OC spray into the rear windshield of the squad car. Officers did not warn Tubby that they would spray the OC spray. PPFOFGB ¶ 33. Tubby yelled and started bouncing up and down in the seat. GBPFOF ¶ 91.

Soon thereafter, Tubby rapidly exited the back of the car through the rear windshield and got onto his knees on the trunk of the squad car. Tubby then stood on the trunk of the squad car, facing out toward the officers. *Id.* ¶ 92. His left hand was visible, but his right hand was under his shirt. BCPFOF ¶ 114. Sgt. Denney assessed Tubby's hands to see if they were both visible and free of a weapon. Because only Tubby's left hand was visible when he jumped out of the rear windshield, Sgt. Denney discharged one round from a beanbag gun, which hit Tubby in the lower abdomen. GBPFOF ¶ 93. The beanbag round caused Tubby to fall off of the trunk of the squad car and land on the ground next to the car. *Id.* ¶ 94; BCPFOF ¶ 116. Tubby then rose to his feet and stumbled in the direction of the open sally port door where Officer O'Brien and other officers were standing. GBPFOF ¶ 95; BCPFOF ¶ 117.

At this time, Officer Salzmann opened the back doors of the Bearcat and K9 Pyro, who was on a 15-foot lead, jumped out and rounded the corner of the Bearcat. As Officer Salzmann rounded the corner of the Bearcat behind Pyro, he saw Tubby stumbling backwards toward the squad car then move toward the blue transport van and entrance of the sally port. GBPFOF ¶ 97. As Tubby moved around the transport van toward the sally port entrance, Pyro engaged Tubby in

the buttock area. As Pyro engaged Tubby, Officer Salzmann pulled back on Pyro's lead to pull Tubby back and prevent him from advancing toward the officers near the sally port entrance. *Id.* ¶ 98. Sgt. Denney positioned himself near the rear of his squad car and fired a second beanbag round at Tubby. *Id.* ¶ 99; PPFOFGB ¶ 38. The beanbag round hit Tubby, and he fell to the ground, alive, with his head landing near the rear bumper of Sgt. Denney's squad car. PPFOFGB ¶ 39. As Tubby fell to the ground, his right hand was empty and fell above his head. *Id.* ¶ 40. Tubby's body was pulled backward by the police canine. *Id.* ¶ 41. Officer O'Brien then opened fire— shooting Tubby five times. *Id.* The time between Tubby exiting the rear windshield and Officer O'Brien shooting Tubby was approximately ten seconds. GBPFOF ¶ 109. No other officer fired his or her weapon. PPFOFGB ¶ 51.

According to the defendants, shortly after the OC spray was deployed into the back of the squad car, Officer O'Brien heard a noise and then saw Tubby "erupting" from the backseat of the squad car. GBPFOF ¶ 100. As Tubby came out onto the trunk, Officer O'Brien could see Tubby's left hand but could not see his right hand, as it was concealed under his shirt behind his left hand. Officer O'Brien retreated back to his position of cover. *Id.* ¶ 101. Officer O'Brien peeked back around the corner of the door jamb and saw Tubby in an upright position, leaning slightly forward as he rushed toward the sally port entrance door where Officer O'Brien and other officers were located. *Id.* ¶ 102. Tubby's right hand was still concealed under his shirt as he rushed toward the sally port door. *Id.* ¶ 103. Officer O'Brien retreated back into his position of cover and, simultaneously, Tubby came back into Officer O'Brien's line of sight from that position of cover. *Id.* ¶ 104. Officer O'Brien believed that Tubby was armed and that Tubby would shoot through his clothing at him or other officers. *Id.* ¶ 105. Officer O'Brien heard a "pop" sound and believed Tubby shot the gun he was concealing under his clothing. *Id.* ¶ 106. Officer O'Brien observed Tubby's body was descending in a downward direction. *Id.* ¶ 107. He noted that Tubby's body

was twisting to the left and saw Tubby look across his body to the left and toward the officers that were located behind Sgt. Denney's squad car. *Id.* ¶ 108.

Deputies Mleziva and Winisterfer relied on information they learned from officers on scene and believed that Tubby was armed with a gun. BCPFOF ¶ 120. Deputy Winisterfer was standing in the open sally port area and perceived Tubby to be running at him with something under his shirt. *Id.* ¶ 121. He feared that he was the last line of defense as exterior scene security, and if Tubby got past him, then other individuals or citizens in the community could be in danger. *Id.* ¶ 122. Deputy Mleziva was closer than 15 to 20 feet from Officer O'Brien at the time Officer O'Brien fired his weapon and also perceived himself to be in imminent danger. *Id.* ¶¶ 127–28. Officer O'Brien stepped in front of Deputy Winisterfer before firing his weapon. *Id.* ¶ 126.

Once Tubby was down, officers at the scene radioed for medical assistance and nurses attempted lifesaving aid measures to Tubby. *Id.* ¶ 130. Sgt. Denney, Officer Merrill, and Officer Christensen approached Tubby with a shield. GBPFOF ¶ 123. The officers used the shield to pin Tubby's hands to his chest, so they could pull Tubby's hands down. *Id.* ¶ 124. At this time, the officers saw both of Tubby's hands and that he was unarmed. *Id.* ¶ 125.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the Court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)

(citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Excessive Force Claim against Officer O'Brien

The Court begins with Plaintiffs' claim that Officer O'Brien used excessive force in violation of the Fourth Amendment since that claim is the predicate for all of their remaining claims. The Green Bay Defendants assert that summary judgment should be granted as to this claim because Plaintiffs cannot meet their burden of showing that Officer O'Brien's use of deadly force was unreasonable. Alternatively, the Green Bay Defendants argue that the undisputed evidence establishes that Officer O'Brien is entitled to qualified immunity.

A police officer's use of force to effect an arrest is a seizure within the meaning of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Graham v. Connor*, 490 U.S. 386, 388 (1989). As such, it is subject to the Fourth Amendment's reasonableness requirement. *Id.* In order to prevail on a claim under § 1983 that an officer used excessive force against an arrestee in violation of his Fourth Amendment rights, "[a] plaintiff must show the officer's use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of the circumstances." *Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018). "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. Even without any possibility of escape, an officer is justified in using

deadly force when he reasonably believes the suspect poses an imminent threat of serious physical harm to himself or others. *Siler v. City of Kenosha*, 957 F.3d 751, 758–59 (7th Cir. 2020).

The inquiry required to assess an excessive force claim involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. This inquiry is highly fact-intensive and "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted).

The Court's analysis of the objective reasonableness of an officer's actions must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "This is true even when, as judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) (quoting *Heien v. North Carolina*, 574 U.S. 54, 61 (2014)). Finally, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

The relevant question here is whether Officer O'Brien reasonably believed that Tubby posed a threat of death or serious bodily injury based on the information Officer O'Brien had at the time he shot Tubby. The record before the Court establishes that Tubby intentionally led Officer O'Brien and the other law enforcement officers who were present at the Jail to believe he

was armed. Tubby managed to manipulate his body and move his hands, which were originally handcuffed behind his back, to his front where he hid them under his shirt and, pretending he had a gun, threatened to "do it." Officer O'Brien's statement that he observed what appeared to be the cylindrical shape of the end of a gun barrel pressed against the inside of Tubby's shirt is consistent with the video images that appear on the recording from the squad's internal camera.



Figure C: Camera Footage from Squad #42 (9:02:35 p.m.)

Dkt. No. 121-20 at 13. It is clear from the officers' description of Tubby's statements and behavior, confirmed by the audio/video recording, that Tubby was pretending that he was armed with a gun and intent on using it at least on himself. Given the risk of death or serious bodily harm that a firearm poses, it was not unreasonable to take Tubby's threats seriously.

Plaintiffs contend that a factual dispute exists as to whether Officer O'Brien truly believed Tubby was armed, noting that he did not use the word "gun" in his initial communications with dispatch. Plaintiffs suggest that Tubby put his hands under his shirt because they were cold and got stuck there. Plaintiffs also contend that Officer O'Brien has a history of dishonesty, pointing to his omissions in his 2012 employment application with the Green Bay Police Department. But

as explained above, Officer O'Brien's statements concerning what he saw and heard are corroborated by Officer Wernecke and the recording of Tubby's behavior when he was left alone in the squad. Officer O'Brien told various responding officers that he thought Tubby had a gun, including Officer Wernecke. Although Officer Wernecke felt confident in his search of Tubby when he placed him in the squad, he later thought he must have missed something as the events in the sally port unfolded.

That the officers truly believed Tubby had somehow managed to arm himself was also clear from their response. For approximately forty minutes, officers attempted to get Tubby to show his hands and exit the squad car. Officer Allen then knocked out the rear windshield to communicate with Tubby, and Tubby refused multiple commands to show his hands. Although Officer Allen saw that one hand was clear, Tubby did not show him his other hand. After Officer Allen deployed OC spray into the rear windshield of the squad car, Tubby rapidly exited the car through the rear windshield and stood on the trunk of the squad car with his right hand under his shirt. Tubby fell off the trunk of the squad car after being hit in the abdomen with a beanbag gun round and landed on the ground next to the car. He then rose to his feet and moved in the direction of the open sally port door where Officer O'Brien and other officers scurried for cover. Officer O'Brien heard the "pop" of the beanbag shotgun and believed that Tubby shot the gun he was holding under his shirt. Approximately ten seconds elapsed from the time Tubby climbed out the rear windshield of the squad car to the time Officer O'Brien shot him. In the split-second of time Officer O'Brien had to react, he fired his weapon.

As we know now, Tubby was only pretending to be armed. Officer O'Brien's decision to use deadly force on the mistaken belief that Tubby was armed and an imminent danger to himself and others was tragic, but that does not make it unconstitutional. Whether an officer is ultimately correct that a suspect was armed is not the issue. Indeed, in *Sherrod v. Berry*, the court held that

16

evidence that the suspect was unarmed was irrelevant to the question whether the officer's decision to use deadly force was reasonable and thus was inadmissible in the civil rights action arising from the shooting. 856 F.2d 802 (7th Cir. 1988) (*en banc*). The issue in such a case is whether the officer reasonably believed the suspect was armed based on the information available to him at the time he fired the fatal shot. *Id.* at 804–05. A mistaken understanding of the facts that is reasonable under the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment. *Milstead v. Kibler*, 243 F.3d 157 (4th Cir. 2001) *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Hill v. California*, 401 U.S. 797, 803–04 (1971) (holding that when police have probable cause to arrest first party but reasonably mistake second party for first party, arrest of second party is not violation of Fourth Amendment).

Plaintiffs assert that deadly force was not justified because, at the time Officer O'Brien fired, Tubby was handcuffed, facedown, under the control of a police canine, blinded by OC spray, and outnumbered twenty-to-one by police. "It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. But that principle depends critically on the fact that the suspect is indeed subdued." *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009) (internal citations omitted). It does not apply when the suspect falls to the ground while in possession of and firing a gun.

Plaintiffs contend that Tubby was handcuffed and blinded by OC spray, but this did not make him less dangerous in the eyes of the officers at the scene. Although Tubby was handcuffed, he had managed to maneuver his body so that his hands were in front of him and was acting as if he was armed with a gun. Even if blinded by OC spray, he was still able to exit the squad car and rush toward the open sally port door. In addition, Plaintiffs assert that Tubby was outnumbered twenty-to-one. But the number of officers at the sally port does not mean that Tubby did not pose a deadly threat. If anything, the fact that there were numerous officers present increased the danger

since they offered more targets. An armed assailant who is bent on taking life, including his own, poses a severe risk of danger for all who are present.

Plaintiffs also maintain that there is a dispute over whether Tubby was facing Officer O'Brien when Officer O'Brien shot his weapon. Plaintiffs contend that, if Tubby was facedown at the time of the shooting, Officer O'Brien could not have reasonably believed that his life was in danger. To support this theory, Plaintiffs refer to the autopsy photographs to establish the trajectory of the bullets. Based on this evidence, as well as the video evidence and testimony of Officer Wernecke concerning his location at the time the shots were fired, Plaintiffs contend that Tubby was face down on the ground when he was shot.

But even if he had fallen to the ground, Tubby could still pose a deadly threat to those around him. Plaintiffs' argument assumes with hindsight that Tubby did not have a gun that he had already fired once and could readily fire again. But that is not what Officer O'Brien believed. Although Tubby was brought to the ground after being hit with a beanbag gun round and was then engaged by a canine from behind, his upper body was unrestrained and his hand remained hidden under his shirt. The canine engaging Tubby did not establish that he was unarmed. It could not have been more than a couple seconds between the canine attaching and the use of force by Officer O'Brien, and from where he was standing, Officer O'Brien could not see that the canine had engaged Tubby. No reasonable jury could conclude that Tubby was safely subdued before Officer O'Brien shot.

Plaintiffs cite *Weinmann v. McClone*, 787 F.3d 444 (7th Cir. 2015), for the proposition that "an officer cannot simply execute a person for possessing a gun, particularly where that gun is not pointed at officers." Pls.' Br. at 24, Dkt. No. 132. But in that case, the gun that the suicidal plaintiff was holding, a shotgun, was clearly visible and lying across the plaintiff's lap while he was seated in a lawn chair in his garage when the officer entered unannounced and shot him. *Weinmann*, 787

F.3d at 447.  Here, Officer O'Brien reasonably believed that Tubby was armed with a handgun hidden under his shirt, that he had repeatedly refused directions to show his hands, and that he had already shot at least once while fleeing the squad car.

A handgun hidden by a suspect who refuses to comply with a lawful command poses a far more serious threat to an officer, as this video caught on a South Carolina police officer's body camera clearly shows: CBS News, *Estill, South Carolina, Officer's Camera Captures Shooting*, YOUTUBE (Aug. 11, 2017), http://www.youtube.com/watch?v=7Qq3dXfzvdw.  This real-life occurrence illustrates the risks police officers face when they do not know if a suspect is armed. It also makes clear the difficult choices an officer must make when encountering a suspect who refuses to obey a lawful command, an occurrence that is unfortunately far too common in today's world.  Tubby not only refused the officers' lawful commands but intentionally led them to believe he was holding a gun under his shirt, thereby making himself appear to be a serious risk of physical harm to all in the vicinity.  This is also a relevant consideration.  *See Scott v. Harris*, 550 U.S. 373, 384 (2007) ("We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability.  It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that Scott confronted.").

Plaintiffs argue that, even if Officer O'Brien genuinely believed he saw a gun when Tubby was in the squad car, that belief would have been negated at the time Officer O'Brien fired because video footage shows that both of Tubby's hands were empty and visible to officers before the shots were fired.  Plaintiffs contend that the video evidence shows Tubby's empty left hand was visible to officers when the rear windshield of the squad car was broken and that later video evidence shows that Tubby's empty right hand was arguably extended above his head as he fell to the ground.  Plaintiffs cite no evidence, however, that Officer O'Brien was in a position to see both of

Tubby's hands at the same time before he fired. It only takes one hand to fire a handgun. It was not until after Sgt. Denney, Officer Merrill, and Officer Christensen approached Tubby with a shield after he was shot that the officers saw both of his hands at the same time.

In sum, Plaintiffs' arguments that Tubby was not armed are based on hindsight and conjecture. Only the facts known to Officer O'Brien at the time of the seizure matter in the reasonableness determination. Officer O'Brien reasonably believed that Tubby was armed based on Tubby's own actions and statements. When officers repeatedly ordered Tubby to show both of his hands, he did not comply. Tubby rapidly exited the squad car and ran in the direction of the sally port door and the officers stationed there. Officer O'Brien heard a "pop" and believed Tubby was shooting his gun from under his shirt. The fact that other officers can normally distinguish between the sound of a beanbag gun and a firearm when not under stress says little about how an officer might react when he believes a man with a gun is rushing toward him. Under the circumstances he confronted, Officer O'Brien's belief that Tubby posed an imminent threat of serious injury or death to himself or others was reasonable. It thus follows that the force used was not excessive and no Fourth Amendment violation occurred.

**B. Qualified Immunity**

The Green Bay Defendants argue in the alternative that Plaintiffs' claim against Officer O'Brien should be dismissed because he is immune from civil liability for any constitutional violation that may have occurred. Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)

(per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)).  The doctrine reflects an accommodation between the public interest in safeguarding constitutional guarantees on the one hand, and on the other, the concern that subjecting government officials to personal liability and harassing litigation would inhibit them in the performance of their duties.  *Id.*  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "Because of the importance of qualified immunity to society as a whole, the [Supreme] Court often corrects lower courts when they wrongly subject individual officers to liability."  *City & Cty. of San Francisco, California v. Sheehan*, 575 U.S. 600, 611 (2015) (internal citation omitted).

Although the defense of qualified immunity is available to all governmental officials in the performance of discretionary acts, it is especially important for law enforcement officers who are frequently forced to make life and death decisions of constitutional import within a matter of seconds.  This contrasts sharply with nonfatal decisions made by judges who, under *Pierson v. Ray*, 386 U.S. 547, 553–54 (1967), have absolute immunity:

> Judges view facts from afar, long after the gunsmoke cleared, and might take months or longer to decide cases that forced police officers to make split-second decisions in life-or-death situations with limited information.  We as judges have minutes, hours, days, weeks, even months to analyze, scrutinize and ponder whether an officer's actions were "reasonable," whereas an officer in the line of duty all too frequently has only that split-second to make the crucial decision.  The events here unfolded in heart-pounding real time, with lives on the line.  Pobjecky lacked our luxury of pausing, rewinding, and playing the videos over and over.

*Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018) (internal quotation marks and citations omitted).  Other than law enforcement officers, no other government officials are called upon to use deadly force as a normal part of their duties, sometimes, as in the occurrence shown in the video linked above, when their own lives are at stake.  Every decision concerning the use of deadly force carries with it the risk of death or serious bodily injury to someone—the suspect, an innocent

third party, or the officer. To impose personal liability for losses of this magnitude upon officers called upon to act in a split second with less than perfect knowledge and without clear guidance in the law would seriously inhibit the officers in carrying out their duties, if not cause them to leave the profession altogether. It would also thereby seriously endanger the public.

Turning to the specific issue in this case, Plaintiffs cite *Graham*, *Garner*, and various lower court decisions to support their contention that Officer O'Brien's use of deadly force violated clearly established law. But "[w]hile cases like *Garner* and *Graham* are instructive in the excessive force context, they 'do not by themselves create clearly established law outside an obvious case.'" *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 988 (7th Cir. 2021) (quoting *Kisela*, 138 S. Ct. at 1153). None of the cases cited by Plaintiffs involve a suspect pretending he was armed, refusing to obey lawful commands that he show his hands, and rushing toward a group of officers. This is significant. "Determining whether an officer violates clearly established law requires a look at past cases with specificity." *Id.*

The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Specificity is critical to making qualified immunity a workable doctrine in the Fourth Amendment context, where it "is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *accord Sheehan*, 575 U.S. at 613 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."); *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (similar); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (similar). Specificity is particularly

important in cases involving excessive force claims. "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted).

Plaintiffs have failed to identify a controlling precedent that "squarely governs the specific facts at issue." *Id.* Plaintiffs cite *Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018), which involved the nonfatal police shooting of an unarmed truck driver disputing a parking ticket. Although the truck driver had assaulted him, the officer did not shoot in that case until after the truck driver had stopped fighting, backed up four to six feet away, put his hands up, and said, "I surrender. Do whatever you have to do. I surrender, I'm done." *Id.* at 912. The court reversed the district court's summary judgment dismissing the case based on qualified immunity. In so ruling, the court noted that "[i]f the facts and circumstances show that an individual who once posed a threat has become 'subdued and complying with the officer's orders,' the officer may not continue to use force." *Id.* at 915 (citing *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009)).

*Strand* provides little guidance for this case. Nor does *Estate of Smith v. City of Milwaukee*, 410 F. Supp. 3d 1066 (E.D. Wis. 2019), which involved the fatal police shooting of a fleeing suspect as he lay face up on the ground with his hands plainly visible near his head. *Id.* at 1070 ("What is clear is that Smith was on his back, his feet raised in the air, his hands above his head, and was located in a corner of the yard between the fence and a house, when Heaggan-Brown fired a second shot, this one into Smith's upper left chest."). Tubby led the officers to believe he was armed, repeatedly refused to show his hands, and never surrendered. Although he appears to have fallen as he was running toward the sally port entrance, he was not restrained or subdued in any way that would have prevented him from firing the gun Officer O'Brien reasonably believed he still had and had already fired once. Neither *Strand* nor *Smith* govern the facts of this case. Nor

do any other cases cited by Plaintiffs. For this reason as well, Officer O'Brien is entitled to summary judgment on Plaintiffs' excessive force claim.

## C. Failure to Train and *Monell* Claims against the City of Green Bay and Chief Smith

Plaintiffs assert that the City and Chief Smith failed to train its officers regarding the removal of a non-compliant suspect from a squad car. They also assert a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), alleging that the City has a persistent and widespread custom and practice of using excessive force against unarmed individuals. "[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Illinois*, 630 F.3d 499, 504 (7th Cir. 2010); *see also Tesch v. Cty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) ("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim."). Because Officer O'Brien did not violate Tubby's constitutional rights, Plaintiffs' claim for municipal liability fails.

## D. Failure to Intervene Claim against Deputies Mleziva and Winisterfer

Plaintiffs assert that Deputies Mleziva and Winisterfer are liable under 42 U.S.C. § 1983 for the wrongful death of Tubby based on their failure to intervene and prevent Officer O'Brien from using deadly force. Because Officer O'Brien's use of force was not constitutionally excessive, Plaintiffs' claim that Deputies Mleziva and Winisterfer violated Tubby's rights by failing to intervene necessarily fails. But even if the claim against Officer O'Brien survived, Plaintiffs' claim against Deputies Mleziva and Winisterfer would still fail.

"[A]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the

officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Lanigan v. Vill. of East Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997)).

The undisputed evidence in this case establishes that the deputies could not reasonably be expected to have acted to stop Officer O'Brien from shooting because they did not have a reasonable opportunity to prevent the shooting. "There is a realistic opportunity to intervene if an officer could have 'called for a backup, called for help, or at least cautioned [the other officer] to stop' using excessive force." *Pitzer v. City of East Peoria, Illinois*, 708 F. Supp. 2d 740, 749–50 (C.D. Ill. 2010) (quoting *Abdullahi*, 423 F.3d at 774) (alterations in original). A gunshot is nearly instantaneous, and the deputies could not have prevented the shooting, given the rapidly evolving, fast-paced nature of the situation. Only ten seconds elapsed from the time Tubby exited the squad car to the time Officer O'Brien fired his weapon. There is no evidence from which a reasonable jury could conclude that Deputies Mleziva and Winisterfer had sufficient time to prevent the use of force, which lasted only seconds. Therefore, Deputies Mleziva and Winisterfer are entitled to summary judgment on this claim.

### E. Failure to Train Claim against Brown County, Sheriff Delain, and Captain Michel

Plaintiffs assert that Brown County, Sheriff Delain, and Captain Michel failed to train Brown County officers regarding their duty to intervene, despite known and obvious risks. As an initial matter, the official capacity claims against Sheriff Delain and Captain Michel will be dismissed because they are redundant of the claim asserted against the County. And because Deputies Mleziva and Winisterfer did not violate Tubby's constitutional rights, Plaintiffs' claim

for municipal liability based upon the County's failure to train its officers fails as well. *See Tesch*, 157 F.3d at 477.

## F.  State-Created Danger Claim

Plaintiffs assert that Lieutenant Zeigle, Brown County, and the City of Green Bay created the danger to Tubby that led to the shooting and are thus liable for that state-created danger. The Seventh Circuit has traced the origins of the state-created danger theory of liability to the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). *See King ex rel. King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 817–18 (7th Cir. 2007). In *DeShaney*, the Department of Social Services (DSS) suspected a four-year-old child had been abused by his father but allowed him to return home with his father. 489 U.S. at 192. Shortly thereafter, the father beat the child nearly to death, and the child and his mother sued DSS under 42 U.S.C. § 1983. *Id.* at 193. Although the Supreme Court noted that the Constitution imposes a duty upon the state to protect individuals with whom it has a "special relationship" by virtue of the state's custody over the individual, *id.* at 199–200, the Court observed that the Due Process Clause of the Fourteenth Amendment generally does not impose a duty upon the state to protect individuals from harm by private actors. *Id.* at 195–96. It explained that the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202. The Court held that, because "the State had no constitutional duty to protect [the child] against his father's violence, its failure to do so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause." *Id.* at 202.

Though the Supreme Court's decision in *DeShaney* does not contain any mention of a "state-created danger" exception to its holding, "courts of appeals have . . . inferred from *DeShaney* that the substantive component of the Due Process Clause imposes upon the state a duty to protect individuals against dangers the state itself creates under the state-created danger doctrine." *King*,

496 F.3d at 817. The Seventh Circuit has articulated a three-part test to determine whether the state-created danger exception to *DeShaney* applies: "First, the state, by its affirmative acts, must create or increase a danger faced by an individual. Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual. Third, the state's failure to protect the individual must shock the conscience." *Johnson v. Rimmer*, 936 F.3d 695, 708 (7th Cir. 2019) (citing *King*, 496 F.3d at 817–18).

The Seventh Circuit in *Weiland v. Loomis*, 938 F.3d 917 (7th Cir. 2019), recently called into question whether the state-created danger theory of liability can be inferred from *DeShaney*. The court noted that, "[i]n recent years, the 'state-created danger' exception has been treated as if it were a rule of common law" and has been turned into a "'three-part test.'" *Id.* at 920. "Every once in a while," the court observed, "a court should step back and ask whether local jurisprudence matches the instructions from higher authority." *Id.* at 921. The court ultimately found that it did not need to decide whether the Circuit's approach should be revised because it found that the state actor was entitled to qualified immunity. The court has since issued a decision applying the state-created danger exception in *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019). Despite *Weiland*'s concern that the Supreme Court has not recognized the state-created danger theory of liability, the Seventh Circuit has recognized the exception, and the three-part test articulated in *Johnson* and *King* apparently remains the standard for determining whether the state-created danger exception applies in certain circumstances.

Regardless of whether such a claim is still viable, the state-created danger exception has no application to the facts of this case. The exception applies only to situations where state action gives rise to harm by third parties or renders a citizen more vulnerable to such harm. It was intended to be a narrow exception to the general rule that the state has no duty to protect its citizens from private harms. The exception has its origins in cases in which state actors played a role in

the creation of a private danger or rendered a citizen more vulnerable to the private danger. In those cases, the plaintiffs did not have recourse under § 1983 against the actor or occurrence that directly injured them because those actors or sources of harm were not occurring within the scope of a state actor's employment. Here, Plaintiffs can (and have) asserted claims under § 1983 against Officer O'Brien, other officers present at the scene, the City, and the County. It makes no sense to apply the state-created exception where the state actors are themselves alleged to have caused the harm.

Although Plaintiffs cite *Jensen v. City of Oxford*, 145 F.3d 1078 (9th Cir. 1998), and *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005), to support their assertion that the exception applies in cases in which the danger created by an officer comes from the decisions made by another officer, those cases do not actually stand for the proposition that Plaintiffs suggest. *Pena* involved the actions of an intoxicated off-duty police officer whose conduct occurred outside the scope of his employment, and *Jensen* does not even mention the state-created danger theory of liability. In short, the state-created danger exception does not apply to cases in which the alleged direct harm was inflicted by a state actor acting in the course of his office, and Plaintiffs' claim against Lieutenant Zeigle, Brown County, and the City of Green Bay fails on this basis.

It should also be noted that, even if the exception did apply, Plaintiffs' claim would fail on the merits because Plaintiffs cannot establish the key element that Defendants' conduct "shocks the conscience." "The shocks the conscience prong is an attempt to quantify the rare most egregious official conduct required for substantive due process liability." *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015) (internal quotation marks and citation omitted). Conscious-shocking conduct "requires a culpable state of mind equivalent to deliberate indifference." *Estate of Her*, 939 F.3d at 876. The Seventh Circuit has explained that, under this standard, "governmental defendants must act with a *mens rea* akin to criminal recklessness for constitutional

liability to attach." *Id.* at 877 (quoting *Flint*, 791 F.3d at 770). "Neither bad decision-making nor grossly negligent behavior meets the stringent test." *Flint*, 791 F.3d at 770; *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.").

Plaintiffs argue that Lt. Zeigle's decision to force Tubby from the squad car shocks the conscience because it was foreseeable that Tubby would be subject to deadly force. Plaintiffs assert that Lt. Zeigle should have instead activated a SWAT team and deployed the Crisis Negotiation Team with members specifically trained in de-escalation techniques. They assert that all officers on the scene, including Lt. Zeigle, had an opportunity to deliberate how to properly handle Tubby's refusal to exit the squad car, but Lt. Zeigle deliberately decided not to deploy the SWAT team or Crisis Negotiators. Pls.' Br. at 29, Dkt. No. 133.

There is no evidence that the defendants were deliberately indifferent in their decision-making. The undisputed evidence shows that Lt. Zeigle's decision-making was guided by his training and was made in good faith to obtain Tubby's peaceful surrender. While Plaintiffs may disagree with Lt. Zeigle's decision to force Tubby out of the squad car and other officers may have pursued different plans, Defendants' conduct was not the type of reckless, conscience-shocking conduct that might be actionable as a constitutional violation.

A third and final reason for granting summary judgment on Plaintiffs' state-created danger claim is that Lt. Zeigle is immune. Even if the state-created danger exception applied to this case and even if the evidence supported such a claim, summary judgment would nevertheless be granted in his favor on qualified immunity grounds. As noted above, the doctrine of qualified immunity protects government officials from liability for civil damages insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As with the claim against Officer

O'Brien, summary judgment is proper here because Plaintiffs have not identified, and the Court has not found, a controlling case or robust collection of persuasive authority that extends the state-created danger exception to cases where an alleged harm was inflicted by a government employee acting in the course of his office or analogous to the set of facts presented here that clearly establishes that Lt. Zeigle's conduct violated the Due Process Clause. "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *Sheehan*, 575 U.S. at 611 (internal quotation marks, citations, and alterations omitted). Because no clearly established law supports the claim against Lt. Zeigle, he is entitled to qualified immunity.

### G. State Law Claims

Plaintiffs have alleged state law claims against the defendants. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). The Court follows this presumption and declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. Accordingly, Plaintiffs' state law claims against the defendants are dismissed without prejudice so that they may be pursued in a state forum.

## CONCLUSION

For the reasons set forth above, the Green Bay Defendants' motion for summary judgment (Dkt. No. 116) and the Brown County Defendants' motion for summary judgment (Dkt. No. 108) are **GRANTED** with respect to the federal claims, and such claims are **DISMISSED**. The remaining state law claims are **DISMISSED without prejudice**. Plaintiffs' unopposed motion to restrict the medical examiner's report (Dkt. No. 112) and unopposed motion to restrict the autopsy photos (Dkt. No. 134) are **GRANTED**. Plaintiffs' motion to change venue to Milwaukee (Dkt. No. 106), motion to exclude expert opinions of John Peters (Dkt. No. 109), and motion to exclude expert testimony of Robert Willis (Dkt. No. 115) are **DENIED as moot**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 19th day of May, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge